UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| SHAF-LAND, L.L.C., | ) | C.A. NO.: 3:15-CV-00588-JJB-SCR |
| | ) | |
| Plaintiff, | ) | JUDGE: JAMES J. BRADY |
| | ) | |
| vs. | ) | MAGISTRATE: ERIN WILDER-DOOMES |
| | ) | |
| SUNBELT CHEMICALS CORP. | ) | |
| and AIG SPECIALTY INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


30(b)(6) DEPOSITION OF SUNBELT CHEMICALS CORP.
TIMOTHY CAPP
TAKEN ON BEHALF OF THE DEFENDANTS



DATE TAKEN:     FRIDAY, NOVEMBER 11, 2016

TIME:           9:06 A.M. - 11:32 A.M.

PLACE:          HILTON GARDEN INN
                55 TOWN CENTER BOULEVARD
                PALM COAST, FLORIDA 32164

REPORTED BY:    DOREEN M. MANNINO
                COURT REPORTER
                NOTARY PUBLIC-STATE OF FLORIDA


**EXHIBIT**
4

1          MS. WARD:  No, that's quite all right.

2          First of all, let me state for the record

3      this is Exhibit 2 and it's Bates stamped

4      Shaf-Land 001155 through 1178.

5          (Whereupon, the aforementioned document

6      was marked as Defendant's Exhibit 2 for

7      identification as of this date.)

8  BY MS. WARD:

9     Q     Okay.  Can you identify this document for

10  me, please?

11    A     Yes, that's an e-mail that I received

12  from Veronica Pryor on March the 3rd with

13  attachments.

14    Q     Just for the record, Veronica Pryor is

15  legal assistant to Philip Foco with the Bienvenu,

16  Bonnecaze, Foco, Viator & Holinga firm.

17          And I'm reading that from the e-mail,

18  correct?

19    A     Yes.

20    Q     And as you stated, you received this

21  e-mail on March 3rd, 2015?

22    A     I did.

23    Q     Okay.

24          Reading this paragraph here it states,

25  Our firm has been asked to represent Shaf-Land in

1  connection with issues relating to the commercial

2  lease executed between it and Sunbelt on April 4,

3  2008.  Enclosed for your review is correspondence

4  that we directed to Sunbelt on February 13, 2014

5  pursuant to the notice provisions contained in the

6  lease.

7          Did I read that correctly?

8  A    Yes, you did.

9  Q    Okay.  So my first question is the

10  attachment is not dated, correct?

11  A    That is correct.

12  Q    Okay.  So although Ms. Pryor's e-mail

13  states that it was directed to Sunbelt on

14  February 13th, the letter itself is not dated?

15  A    Correct.

16  Q    Okay.  However, you acknowledge that

17  Sunbelt received this letter on March 3rd, 2015,

18  correct?

19  A    I do.

20  Q    Okay.  All right.

21          And can you identify the letter was from

22  counsel for Shaf-Land; is that correct?

23          MR. BRADY:  If you know.

24          THE WITNESS:  Today do I know that, yes.

25      The day I received it one could presume, but

1      and if necessary remediation of the lease premises

2      in accordance with Sunbelt's obligations under the

3      commercial lease and the Louisiana Civil Code.

4                    Did I read that correctly?

5          A      Yes.

6          Q      Okay.  Great.

7                    What did Sunbelt do after it received

8      this letter?

9          A      Sunbelt communicated -- Sunbelt,

10     specifically me because I received the e-mail,

11     communicated with Joe Lancia, the CEO and --

12                   MR. BRADY:  You can tell them that you

13              spoke with an attorney about it.

14                   THE WITNESS:  And I spoke with legal

15              counsel.

16     BY MS. WARD:

17         Q      All right.  So Joe Lancia and legal

18     counsel?

19         A      Correct.

20         Q      And Joe Lancia I think you said was CEO?

21         A      He is the CEO.  That's correct.

22         Q      And was Mr. Lancia the CEO as of March

23     3rd, 2015?

24         A      He was.

25         Q      Okay.  And he is still the CEO?

Page 33

```
 1      A      He is.

 2      Q      Okay.  And then you also referenced that

 3   you spoke to legal counsel after receiving this.

 4      A      I did.

 5      Q      Okay.  And can you identify the legal

 6   counsel?

 7      A      Jim Holmes.

 8      Q      Is Mr. Holmes with a firm?

 9      A      He is.

10      Q      Do you know the name of his firm?

11      A      Nelson, Mullins.

12      Q      And do you know where they're located?

13      A      I believe his office is Atlanta, but I'm

14   fairly certain that Nelson, Mullins is a

15   multi-location law firm.

16      Q      Okay.  As of March 3rd, 2015 did

17   Mr. Holmes act as counsel for Sunbelt?

18      A      I -- I'm --

19      Q      That's okay.  If my question doesn't make

20   sense, you can tell me that.

21      A      I'm not sure what I can say and what I

22   can't say in regard to legal counsel.

23             MR. BRADY:  You can tell her if Jim

24         Holmes was your lawyer or not or Sunbelt's

25         lawyer.
```

Page 34

1          MS. WARD:  Yes.  Thank you.

2          MR. BRADY:  What privilege protects is

3     your communications.

4          THE WITNESS:  Jim Holmes is corporate

5     counsel for us.

6  BY MS. WARD:

7     Q     So Mr. Holmes is corporate counsel for

8  Sunbelt as of March 3rd, 2015?

9     A     Yes.

10    Q     Does he remain corporate counsel for

11 Sunbelt?

12    A     He does.

13    Q     Okay.  Fair enough.

14          And it's your understanding, you think

15 that his office is located in Atlanta, Georgia?

16    A     Correct.

17    Q     Okay.  We are going to get to this.

18          MR. BRADY:  Let's go off the record for a

19     second.

20          MS. WARD:  Yes.

21          (Whereupon, an off-the-record discussion

22     was held.)

23          MR. BRADY:  For the record, there are two

24     e-mails that were produced by Sunbelt.  They

25     are Bates labelled Sunbelt 46 through 70 and

Page 35

1          71 through 72.   These were produced by

2          Sunbelt.   We're going to claw those back.

3               At the time they were produced, they were

4          produced inadvertently.   I was unaware that

5          Jim Holmes was corporate counsel and that

6          these e-mails are privileged, so we are going

7          to claw those back.

8               MS. WARD:   All right.   Well, we just

9          shortened that up a little bit.

10   BY MS. WARD:

11        Q     Okay.   So you communicated with Joe

12   Lancia.   Can you tell me what -- well, let me just

13   go back.

14             Sunbelt received the letter, which is

15   Exhibit 2, on March 3rd, 2015 and you

16   communicated -- we'll just start for now with your

17   communications with Mr. Lancia.   What did you say to

18   Mr. Lancia?

19             MR. BRADY:   Hold on just a second.

20             You can talk about conversations you had

21          with Mr. Lancia as long as your counsel was

22          not present.

23   BY MS. WARD:

24        Q     So let me start my questions over.

25             Mr. Capp, you received the letter on

Page 36

1   March 3rd, 2015.  And you stated that when you

2   received this letter, you communicated with

3   Mr. Lancia.

4          Your initial communication, how was that;

5   was it a phone call, was it an e-mail?

6     A     I called him and forwarded him the

7   e-mail.  I don't know which I did sooner.

8     Q     That's fine.  Okay.

9          So Mr. Lancia also received this March

10  3rd, 2015 letter?

11    A     He did.

12    Q     Okay.

13         Was anyone on the phone call that you

14  referenced?  Was it just you and Mr. Lancia or was

15  there anybody else on that call?

16    A     Just Mr. Lancia and myself.

17    Q     Okay.  And can you tell me what you and

18  Mr. Lancia discussed on that phone call?

19    A     We discussed the nature of the letter and

20  the broad comments in the letter and thought it wise

21  that we seek counsel.

22    Q     Okay.  You stated that you discussed the

23  nature of the letter, what do you mean by that?

24    A     The -- first of all, the facts of the

25  letter and then whether we thought there was any

1   respond to this letter?

2        A     Yes.

3        Q     Okay.  Did Sunbelt report this letter to

4   Wells Fargo?

5             MR. BRADY:  Object to form.

6             MS. WARD:  What's the objection?

7             MR. BRADY:  Time frame.

8             MS. WARD:  Okay.

9   BY MS. WARD:

10       Q     March 3rd, 2015 Sunbelt receives the

11  letter.  Did at anytime Sunbelt report this letter

12  to Wells Fargo?

13       A     Yes.

14       Q     Okay.  When?

15       A     You're asking me to remember a lot of

16  e-mails right now and a lot of phone conversations

17  and put dates on those that happened a year and a

18  half ago.

19       Q     I know.  Sorry.  That's just what we do.

20       A     In an official e-mail form, I don't

21  recall an e-mail before October.  But I maybe

22  mistaken in that fact.

23       Q     Okay.  I will represent to you that

24  having reviewed Wells Fargo's production, as well as

25  Sunbelt's production, that the first e-mail that we

Page 40

1   have seen regarding the demands made in this letter

2   between Sunbelt and Wells Fargo was October 2015.

3   So I think that your recollection is consistent with

4   the documentation.  Okay?

5             So can we just then agree that Sunbelt,

6   as you said, I guess, in an official e-mail, the

7   first official e-mail from Sunbelt to Wells Fargo

8   with regard to this letter -- the demands made in

9   this letter was the October 2015 time period?

10            MR. BRADY:  Object to form.  Just the

11        word "official" e-mail.

12            MS. WARD:  Well, I'm using his word.  He

13        said in an official e-mail form.

14   BY MS. WARD:

15        Q     I'm using your term.

16        A     That's what I recollect at this point in

17   time.

18        Q     Okay.  And I think that the record will

19   support that.

20        A     Yes.

21        Q     So that's fine.  Thank you.  Okay.

22             And you did state in official e-mail

23   form.  Did Wells Fargo report -- excuse me.  Strike

24   that.

25             Did Sunbelt report this letter to Wells

1    Fargo in something other than official e-mail form?

2         A     I think the answer to that's yes.

3         Q     Okay.  Why do you think the answer is

4    yes?

5         A     Because there are a number of phone calls

6    between myself and Matt Puckett.

7                I should back up.  You said this letter.

8    No.  This letter, no.

9         Q     Okay.  So you did not report -- Sunbelt

10   did not report this letter to Wells Fargo?

11        A     You said this letter, no.  The answer's

12   no.

13        Q     Okay.  What did Sunbelt report to Wells

14   Fargo?

15        A     We received another communication in May.

16   And my recollection is that I had a phone

17   conversation with Matt Puckett over this.

18                THE WITNESS:  Is it possible to take a

19           real quick break while you're looking for

20           documents?

21                MS. WARD:  Absolutely.

22                (Whereupon, a recess was taken.)

23                MS. WARD:  Back on the record.

24   BY MS. WARD:

25        Q     We just took a brief break and we are

Page 42

1    back on the record.

2              I'm going to go back into some of your

3    testimony.  But first, just so we can keep those

4    chronological, March 3rd, 2015 Sunbelt receives the

5    letter.  You have communications with Mr. Lancia and

6    Mr. Holmes.  Sunbelt makes a corporate decision to

7    not respond to Shaf-Land.  Correct?

8         A    Correct.

9         Q    Sunbelt also does not report this letter

10   to Wells Fargo, correct?

11        A    Correct.

12        Q    Okay.  And we were talking earlier about

13   the renewal process and how Sunbelt completes

14   applications.

15             I'm going to hand to you what's been

16   marked as Exhibit 3.

17             (Whereupon, the aforementioned document

18        was marked as Defendant's Exhibit 3 for

19        identification as of this date.)

20   BY MS. WARD:

21        Q    Mr. Capp, can you just identify what this

22   document is?

23             And for the record, it's Bates Nos. 256

24   through 266.

25        A    It is the AIG EAGLE app.

Page 49

1               No, I don't recall.

2     Q    Okay.

3               Have you produced your Shore-Tel records?

4     A    No.

5     Q    Or your cellphone records?

6     A    No.

7     Q    And describe for me what you and

8     Mr. Puckett talked about on this call.

9     A    We talked about the renewal, and we

10    talked about the fact that we were in the process of

11    getting tail coverage for the same property.  And

12    now I have this letter.

13    Q    And what did Mr. Puckett say?

14    A    He wondered how significant an issue it

15    was.

16    Q    Did he ask you if you wanted to report

17    this claim to any of your insurers?

18    A    Not to my recollection, no.

19    Q    Did you tell him Sunbelt wanted to report

20    this claim to its insurers?

21    A    No.

22    Q    Did you report, you being Sunbelt, did

23    Sunbelt report the March 3rd, 2015 letter, which is

24    Exhibit 2 to your deposition, to AIG Specialty

25    Insurance Company?

Page 51

1    that Sunbelt did not report the March 3rd, 2015

2    letter to Wells Fargo; is that correct?

3        A     That is correct.

4        Q     Okay.  So is it your testimony that Wells

5    Fargo then would have reported the March 3rd, 2015

6    letter to AIG Specialty Insurance Company?

7              MR. BRADY:  Object to form.

8              THE WITNESS:  Obviously not.

9    BY MS. WARD:

10       Q     Okay.  I was trying to clarify your other

11   statement.  Okay.

12             So when you say that you presumed that

13   Wells Fargo reported this to AIG Specialty Insurance

14   Company, you're referring to the May 5, 2015

15   communication; is that correct?

16       A     Would you please repeat the question?

17   I'm sorry.

18             MS. WARD:  Can you read that back?

19             (Whereupon, the referred to question was

20         read back by the Reporter.)

21             MR. BRADY:  Can I clarify?

22             Are you asking about what Wells Fargo may

23         have or may not have reported?  Are we talking

24         about the claim generally or the fact of that

25         specific letter?

1   from Wells Fargo.

2        Q    Okay.  So you are presuming that Wells

3   Fargo reported to AIG Specialty Insurance Company

4   this May 5, 2015 communication?

5        A    I'm presuming they purported to AIG the

6   claim information when it was necessary to have the

7   claim information provided.  I don't know

8   specifically this communication or a different

9   communication.  I do presume that they would have

10  communicated at the right time the claim

11  information.

12       Q    Okay.  But Sunbelt's first communications

13  with Wells Fargo on this claim were May 2015; is

14  that correct?

15       A    It is.

16       Q    Okay.  And you stated that you presumed

17  that Wells Fargo would report the claim -- I'm using

18  your word --

19       A    Yes.

20       Q    -- to AIG Specialty Insurance Company?

21       A    If needed, yes.

22       Q    Okay.  Did you ever have any

23  communications, either telephone or e-mail or

24  letter, with Wells Fargo talking about whether or

25  not this claim was going to be reported to AIG

Page 54

1    Specialty Insurance Company?

2        A    Not to my recollection, no.

3        Q    Did Wells Fargo ever tell Sunbelt, We've

4    reported this claim to AIG Specialty Insurance

5    Company?

6        A    No.

7        Q    Did AIG ever recommend to Sunbelt that

8    this claim be reported to AIG Specialty Insurance

9    Company?

10            MR. BRADY:  You said AIG.  You probably

11        meant to say Wells Fargo.

12            MS. WARD:  All right.  Strike all of

13        that.

14            MR. BRADY:  Just on the last one.

15            MS. WARD:  I know, but now I don't

16        remember what I said.

17   BY MS. WARD:

18        Q    Did Wells Fargo ever recommend to Sunbelt

19   that this claim be reported to AIG Specialty

20   Insurance Company?

21        A    Yes.

22        Q    Okay.  When?

23        A    October.

24        Q    October 2015?

25        A    Yes.

1   Multiple communications with Wells Fargo and AIG.

2        Q    Okay.  Does Sunbelt have any evidence

3   that prior to the commencement -- strike that.

4             Does Sunbelt have any evidence that prior

5   to the commencement of this lawsuit that AIG -- that

6   any entity reported the substance of Shaf-Land's

7   claims to AIG?

8        A    I do not.

9             MS. WARD:  All right.  Let me attach

10       Exhibit 5.

11            (Whereupon, the aforementioned document

12       was marked as Defendant's Exhibit 5 for

13       identification as of this date.)

14  BY MS. WARD:

15       Q    For the record, this is Sunbelt 1735

16  through 1736.  And it is a series of e-mails, the

17  first of which is from Veronica Pryor dated May 5,

18  2015 to Tim Capp.  And it appears, Mr. Capp, that

19  you then forwarded on the same date that e-mail to

20  Joe Lancia.  And Mr. Lancia responded to you also on

21  that same date, May 5th, 2015; is that correct?

22       A    That is correct.

23       Q    The issue here is that Ms. Pryor's May

24  5th, 2015 e-mail states, Please see the attached

25  correspondence being mailed today with regards to

1       Q      At Wells Fargo?

2       A      At Wells Fargo.

3       Q      Okay.

4       A      And later with Heather Engel.

5       Q      Also at Wells Fargo?

6       A      At Wells Fargo.

7              Or Matt Puckett.

8       Q      Okay.  He was your claim consultant at

9   Wells Fargo; is that his title?  Do you know?

10             That may not be his exact title?

11      A      It's not his title.

12      Q      Okay.

13      A      It's on his proposal.  That's not his

14  title.

15      Q      Okay.

16      A      Claims consultant.

17      Q      Okay.  So if a claim was made against

18  Sunbelt, Sunbelt would contact Wells Fargo; is that

19  correct?

20      A      Yes.

21      Q      Okay.  At that point would Wells Fargo

22  immediately report the claim to an insurance company

23  or would Wells Fargo ask if Sunbelt wanted to report

24  that claim?

25             MR. BRADY:  I'm going to object.  It

1        might call for speculation.

2              If you know.

3              THE WITNESS:  Well, immediate is a time

4        frame, so I'm not going to speak to immediate.

5        I can't speak to immediate.

6              I don't think they're going to file a

7        claim that we don't want to them to file.

8    BY MS. WARD:

9        Q      Right, because there maybe circumstances

10   where Sunbelt, just like any company, may not

11   necessarily want to report a claim to an insurance

12   company.

13       A      Correct.

14       Q      Okay.  So just because Sunbelt reports a

15   claim to Wells Fargo, Sunbelt doesn't assume that

16   that claim is automatically or necessarily reported

17   to its insurance company?

18              MR. BRADY:  Object to form.  Asked and

19        answered.

20              You can answer.

21              You can read back the question to him.

22              (Whereupon, the referred to question was

23        read back by the Reporter.)

24              THE WITNESS:  So if the word is

25        automatically, no.  I don't think it's

Page 68

1        automatic.

2             MS. WARD:  Was the word automatic in

3        there?

4             THE COURT REPORTER:  You did say

5        automatically, yes.

6             MS. WARD:  Okay.  Thank you.

7    BY MS. WARD:

8        Q    If Sunbelt reports a claim to Wells

9    Fargo --

10       A    Yes.

11       Q    -- does Sunbelt assume that that claim

12   will be reported to the insurance company?

13       A    If it's agreed that it needs to be filed,

14   yes --

15       Q    Okay.

16       A    -- we do assume it will be reported.

17       Q    Okay.  And when you say if it's agreed

18   that it needs to be filed, if there is an agreement

19   by Sunbelt that they want to report that claim to

20   its insurance company?

21       A    We receive counsel from Wells Fargo along

22   the way and then agree or disagree whether it needs

23   to be filed, yes.

24       Q    And by filed you mean reported to the

25   insurance company?

Page 69

1       A       Report, correct.

2       Q       To your insurer?

3       A       Correct.

4       Q       Okay.  And this is just an example,

5   Exhibit 6.  I believe this is a claim.

6               Well, let me hand this to you first and

7   you can tell me.  It is my understanding that when

8   Sunbelt was getting ready to vacate the Louisiana

9   property that you identified, that there may have

10  been some property that was stolen.  Do you recall

11  that?

12      A       I do.

13      Q       Okay.

14              MS. WARD:  And so, for the record, this

15          Exhibit 6 is Sunbelt 1478 to Sunbelt 1481.

16              (Whereupon, the aforementioned document

17          was marked as Defendant's Exhibit 6 for

18          identification as of this date.)

19  BY MS. WARD:

20      Q       And if we take a look sort of going

21  backwards, there is an e-mail dated January 9, 2015

22  from you, Mr. Capp, to Matt Puckett, who we've

23  already identified as a Wells Fargo employee,

24  correct?

25      A       Correct.

1      A      We do.

2      Q      Okay.  Fair enough.

3             Has Sunbelt made any claims or demands

4      against Wells Fargo as a result of this litigation?

5      A      No.

6      Q      Okay.  Does Sunbelt have any intention of

7      making any claims against Wells Fargo?

8      A      I can't speculate what's going to happen

9      in the future.

10     Q      Okay.  It seems to me that Sunbelt is

11     disappointed with Wells Fargo or was disappointed

12     with Wells Fargo; is that correct?

13     A      The service level I was disappointed

14     with, yes.

15     Q      Okay.  And you had assumed that Wells

16     Fargo was going to report this claim to your

17     insurance companies; is that correct?

18     A      Correct.

19     Q      Are you disappointed that Wells Fargo did

20     not report those claims to your insurance companies?

21     A      Sure.

22     Q      Do you have any evidence to contradict

23     the statement that AIG Specialty Insurance Company

24     first became aware of Shaf-Land's claims against

25     Sunbelt when AIG was served with this lawsuit?

1          MR. BRADY:  I'm going to object to form,

2      but you can answer.

3          THE WITNESS:  I don't know the

4      communication between Wells and AIG.  I don't

5      know of other communications.

6  BY MS. WARD:

7      Q     Do you have any evidence to suggest that

8  Wells Fargo communicated with AIG Specialty

9  Insurance Company about this claim prior to

10  August 2015?

11      A     I've answered that.  The answer is no.

12          MS. WARD:  Okay.  Fair enough.  Thank

13      you.

14          I think that's all I have.

15          MR. BRADY:  Anthony, your answer is still

16      the same?

17          MR. LASCARO:  Yes.

18          MR. BRADY:  Good.

19          Well, you're done.

20          THE WITNESS:  Thank you.

21          MS. WARD:  I appreciate it.  Thank you

22      very much.

23          (Deposition concluded at 11:32 a.m.)

24

25

## Veronica Pryor

| | |
|---|---|
| **From:** | Veronica Pryor |
| **Sent:** | Tuesday, March 03, 2015 9:15 AM |
| **To:** | 'Tim@sunbeltchemicals.com' |
| **Cc:** | Phillip Foco; 'farmsandacreage@bellsouth.net' |
| **Subject:** | SHAF-LAND, L.L.C. - leased property at 1250 Safe Energy Drive, Port Allen, LA 70767 |
| **Attachments:** | 021315 ltr to Sunbelt.pdf |

Our firm has been asked to represent SHAF-LAND, L.L.C. in connection with issues relating to the Commercial Lease executed between it and Sunbelt Corp. on April 4, 2008. Enclosed for your review is correspondence that we directed to Sunbelt on February 13, 2014 pursuant to the notice provisions contained in the lease. As we have been unable to confirm Sunbelt's receipt and acceptance of this correspondence and because it is important that these matters are addressed as soon as possible, we are forwarding a copy of this correspondence to you via e-mail.

Please do not hesitate to call or contact me if you have any questions. We look forward to your response.

Phillip E. Foco
**Bienvenu, Bonnecaze, Foco, Viator & Holinga APLLC**
4210 Bluebonnet Blvd.
Baton Rouge, LA 70809
(225) 388-5600 Main
(225) 388-5603 Direct
(225) 975-8946 Cell
(225) 388-5622 Fax
Phillip.Foco@bblawla.com

Veronica Pryor
Legal Assistant to Phillip E. Foco
And Katie D. Chabert
**Bienvenu, Bonnecaze, Foco, Viator & Holinga**
4210 Bluebonnet Boulevard
Baton Rouge, LA 70809
Telephone:  (225) 388-5610
Fax:  (225) 388-5622
veronica.pryor@bblawla.com
http://www.bblawla.com


EXHIBIT
2



# BIENVENU BONNECAZE FOCO VIATOR & HOLINGA

*PHILLIP E. FOCO*
*Partner*

225.388.5603 (Direct)
225.388.5622 (Fax)
phillip.foco@bblawla.com

Sunbelt Chemicals Corp.
71 Hargrove Grade
Palm Coast, Florida 32137
Attention: President

**Via Certified Mail**
*Article No. 7013 2250 0000 4911 6564*

Re:      SHAF-LAND, L.L.C.
         Leased property at 1259 Safe Energy Drive, Port Allen, Louisiana 70767

Dear Sir:

My firm has been retained by SHAF-LAND, L.L.C. in connection with issues relating to the Commercial Lease executed between it and Sunbelt Chemicals Corp. on April 4, 2008, which Commercial Lease is attached hereto as Exhibit "A." After Sunbelt recently advised SHAF-LAND that it would not be renewing the Commercial Lease after its primary term concludes on April 3, 2015, SHAF-LAND began the process of marketing the Leased Premises in an effort to identify a new lessee. During this process, SHAF-LAND was made aware that Sunbelt's operations on the Leased Premises during the lease term have caused serious damage to the Leased Premises, including but not limited to damage to the roof, walls, electrical components and structural support system of at least one of the buildings which Sunbelt occupied and in which it conducted its operations during the lease term. For your reference, photographs depicting the condition of the building in question are attached as Exhibit "B." The damage in question is so severe that SHAF-LAND has been advised that the building in question may require demolition and re-construction in its entirety. Under the circumstances, SHAF-LAND is unable to re-lease the premises until the damages caused by Sunbelt's operations are repaired.

Section 17 of the Commercial Lease obligates Sunbelt to "surrender possession of the Leased Premises immediately to Lessor in good order and condition clear of all personal property and broom cleaned and shall repair all damages to the premises, usual wear and tear, acts of God, terrorism, casualty, civil disorder and other conditions beyond the Lessee's reasonable control excepted."

Additionally, Louisiana Civil Code article 2683 obligates a lessee to "use the thing as a prudent administrator and in accordance with the purpose for which it was leased" and "to return the thing at the end of the lease in a condition that is the same as it was when the things was delivered to him, except for normal wear and tear..." Article 2686 provides that "if the lessee uses the thing... in a manner that may cause damage to the thing" the lessor is entitled to recover "any damages he may have sustained." Article 2687 further provides that the "lessee is liable for damage to the thing caused by his fault or that of a person who, with his consent, is on the premises or uses the thing." Finally, Article 2692 obligates the lessee to "repair damage to the thing caused by his fault or that of persons who, with his consent, are on the premises or use the thing, and to

SHAFLAND-001156

repair any deterioration resulting from his or their use to the extent it exceeds the normal or agreed use of the thing." The Louisiana Supreme Court has interpreted these articles to mean that a lessee has an obligation to restore the property to its pre-lease condition at the termination of the lease, minus wear and tear, and to correct any damage caused by the lessee's unreasonable and excessive operations. *Marin v. Exxon Mobil Corp.*, 48 So.3d 234 (La. 10/19/10).

The damage occasioned to the Leased Premises by Sunbelt's operations far exceeds what anyone could consider normal wear and tear and is clearly the result of Sunbelt's unreasonable and excessive operations on the Leased Premises. On behalf of SHAF-LAND, demand is hereby made on Sunbelt to restore the property in accordance with its obligations under the Commercial Lease and the Louisiana Code of Civil Procedure.

Moreover, considering the nature of Sunbelt's operations and the effects which these operations have had on the Leased Premises, environmental contamination is an obvious concern. Accordingly, SHAF-LAND hereby makes demand on Sunbelt to perform the appropriate environmental assessments, and if necessary, remediation of the Leased Premises in accordance with Sunbelt's obligations under the Commercial Lease and the Louisiana Civil Code.

We would also ask that Sunbelt provide a copy of any and all policies of insurance that it was required to maintain pursuant to Section 8 of the Commercial Lease, including but not limited to those policies of insurance on which SHAF-LAND was required to be named as an additional insured, and that Sunbelt place those insurers on notice of the loss occasioned by its operations on the Leased Premises.

Finally, it is SHAF-LAND's position that it is in everyone's best interest to amicably and efficiently resolve these issues so that the Leased Premises can be placed back into the stream of commerce. To that end, please be advised that until the Leased Premises are restored and the appropriate remediation and repairs are conducted, Sunbelt cannot fulfill its obligation to surrender possession of the Leased Premises in accordance with Section 17 of the Commercial Lease or the Louisiana Code of Civil Procedure. Accordingly, if these obligations are not satisfied by the end of the primary term of the Commercial Lease, Sunbelt will be deemed to be in continuing possession of the Leased Premises and will be required to pay rentals on a month to month basis until those obligations are performed and/or to pay all damages that become due under the terms of the Commercial Lease and/or the Louisiana Code of Civil Procedure.

Very truly yours,

BIENVENU, BONNECAZE, FOCO, VIATOR & HOLINGA, APLLC

Phillip E. Foco

PEF/vp

Enclosure

cc:     Tim Capp (via U.S. Mail)

*orig*

# COMMERCIAL LEASE

THIS COMMERCIAL LEASE is entered into effective as of the 4th day of April, 2008 ("Effective Date"), by and between **SHAF-LAND, L.L.C.**, a Louisiana limited liability company ("Lessor") and **Sunbelt Chemicals Corp.**, a South Carolina corporation ("Lessee") who agree as follows:

## 1.
### Parties and Leased Premises

This Commercial Lease (the "Lease") is made by and between SHAF-LAND, L.L.C., a Louisiana limited liability company ("Lessor") and Sunbelt Chemicals Corp., a South Carolina corporation ("Lessee"). Lessor owns, operates or controls certain real property situated in the City of Port Allen, West Baton Rouge Parish, State of Louisiana, which real property (the "Property") is more particularly described on Exhibit A attached hereto. Lessor hereby leases to Lessee three (3) buildings (collectively the "Building") located at the Property containing a total of approximately 75,700 rentable square feet and having a street address of 1259 Safe Energy Drive, Port Allen, Louisiana 70767, together with any parking spaces or areas serving the Property (the "Parking Area(s)"), any driveways, the land upon which they are located and all other buildings and improvements thereon are herein collectively referred to as the "Leased Premises".

## 2.
### In Solido Liability

If the above described property is leased to more than one party, the obligations of all such parties hereunder, as Lessee, shall be in solido.

## 3.
### Term

The "Commencement Date" of this Lease is April 4, 2008. Unless extended or earlier terminated in accordance with the provisions herein, the primary term of this Lease is for a period of seven (7) years and shall begin on the Commencement Date and end on April 3, 2015.

Lessee shall have the option(s) to extend the term of this Lease for (2) consecutive extended term(s), the first extended term shall be for a period of two (2) years, and the second extended term shall be for a period of three (3) years, provided that the Lease is in full force and effect and no material defaults exist under the Lease at the time of such extension. Lessee shall give written notice of its exercise of the respective option at least

- 1 -



ninety (90) days prior to the expiration of the original term or the expiration of the then existing term.  Each extension term shall be upon the same terms and conditions and the monthly base rent during each extension term shall be in the amounts set forth in Section 4 below.

**4.**

**Rental and Place of Payment**

Beginning on the Commencement Date, Lessee shall pay to Lessor, without demand or request on or before the first day of each month of the Term, monthly base rent ("Rent") in the amounts set forth below.   All payments of rent shall be made to Lessor, at the address designated in that Section titled "Notices" but Lessor may, from time to time, designate other persons and places for payment of rent by notice to Lessee. Any rent payment not received by the 10th of the month shall be considered delinquent, and Lessee agrees to pay to Lessor as a "late charge", an amount as additional rent, equal to five percent (5%)  of the amount past due .  The parties agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such payment.  Rent for any partial month of the term of this Lease shall be prorated on a per diem basis.

| Effective Dates | Monthly Base Rent | Annual Base Rent |
| --- | --- | --- |
| Year 1 | $20,979 per month | $251,748  annually |
| Year 2 | $20,979 per month | $251,748  annually |
| Year 3 | $20,979 per month | $251,748 annually |
| Year 4 | $22,079  per month | $264,948  annually |
| Year 5 | $22,079  per month | $264,948  annually |
| Year 6 | $22,079  per month | $264,948  annually |
| Year 7 | $23,151  per month | $277,812  annually |
| Year 8 | $23,151  per month | $277,812  annually |
| Year 9 | $23,151  per month | $277,812  annually |
| Year 10 | $24,224  per month | $290,688  annually |
| Year 12 | $24,224  per month | $290,688  annually |
| Year 13 | $24,224  per month | $290,688  annually |

- 2 -

**5.**

**Utility Charges**

Lessee shall promptly pay all charges for gas, electricity, water, telephone and other utilities, including water sprinkler service charges (if applicable) consumed by Lessee on the Leased Premises, including those used for air-conditioning and heating purposes. All accounts for such utilities shall be carried in the Lessee's name only. The Leased Premises, with electrical power, shall be available to Lessee seven (7) days per week/twenty-four (24) hours per day without additional charge beyond the rent.

**6.**

**Use of Premises**

Lessee shall use the Leased Premises for manufacturing, packaging, marketing and selling of packaged chemicals and other uses incidental thereto, solely for the purpose of carrying out its own business therein, subject to and in accordance with all applicable zoning and other governmental regulations. Lessor hereby further specifically consents to the installation, maintenance and/or operation of the bottle manufacturing equipment and an associated facility by Lessee or its agent in the Leased Premises as an additional permitted use under the Lease. The Lessee and its agents, invitees, guests and employees shall have the exclusive right to the Parking Areas and park vehicles at such Parking Areas overnight. The Leased Premises shall not be used for any unlawful purpose or in any manner that may damage or depreciate the same or the Building. Lessee shall have the right, but shall not be obligated to contest, by appropriate proceedings in the name of the Lessee or Lessor, the validity or application of any law, ordinance, order, rule, regulation or requirement of any nature affecting the Leased Premises and operation of Lessee's business therein.

**7.**

**Tax Responsibility**

Before delinquency, Lessee shall pay taxes assessed during the term of the Lease against inventory, furniture, trade fixtures, apparatus, equipment, or personal property placed by Lessee in the Leased Premises, leasehold improvements installed by Lessee or by Lessor on behalf of Lessee, and any other property of Lessee. Lessor will be responsible for and pay before delinquency any and all payment of all real estate taxes levied against the Leased Premises, Property or Building. Lessee shall reimburse Lessor for the cost of such taxes within thirty (30) days after receiving Lessor's detailed written statement setting forth the amount of such taxes and copies of all invoices and receipts. Lessee's failure to pay within the thirty day period shall entitle Lessor to the same remedies it has upon Lessee's failure to pay rent. Taxes shall be pro rated on a per diem basis for any

- 3 -

portion of the term of this Lease that occurs during a partial tax year. Nothing contained herein shall prevent Lessor, at its sole cost and expense, from challenging any real estate taxes pursuant to any applicable laws and Lessor hereby agrees that Lessee may, at its sole cost and expense, elect to make such a challenge on Lessor's behalf, and Lessor will reasonably cooperate with any such challenge by Lessee.

## 8.
### Insurance

At all times during the term of this Lease and as part of the consideration for this Lease, Lessee shall provide and maintain, at Lessee's expense, in favor of Lessee as the insured, fire and extended coverage insurance covering Lessee's moveable property, any improvements, alterations or additions made by Lessee to the Leased Premises, any property leased to Lessee within the Leased Premises, and any claims which may arise in connection with the Lessee's operation and use of the Leased Premises. Lessee shall maintain during the Term Comprehensive General Liability insurance with combined single minimum limits of $1,000,000.00 per occurrence and an aggregate of $2,000,000.00 for bodily injury, personal injury and property damage liability.

The policy providing such insurance shall name Lessor and any mortgagee of the Leased Premises as additional insured and a certificate or verification of insurance, evidencing such insurance, shall be delivered to the Lessor within ten (10) days after the execution of this Lease. Thereafter, all renewals thereof are to be delivered to Lessor at least five (5) business days in advance of the expiration date of the existing policy or policies.

The foregoing insurance shall be carried with a responsible insurance company authorized to transact business in the State of Louisiana. Lessee shall deliver to Lessor written verification evidencing such insurance in form reasonably acceptable to Lessor, provided that if the Leased Premises are mortgaged during the period of this Lease, such verification shall be delivered to the mortgagee, if requested by the mortgagee.

In the event Lessee should, for any reason whatsoever, fail to keep the Leased Premises so insured or fail to deliver to Lessor, as aforesaid, the certificate or verification of insurance and the renewals thereof, then Lessor, if it so elects, may itself have such insurance effected in such amounts and in such companies as Lessor may deem proper and may pay the premiums therefor and Lessee covenants and agrees that, within five (5) days after payment and demand therefor by Lessor, Lessee shall immediately repay the amount so paid by Lessor as premiums, together with legal interest thereon, from date of such payment until said amount is repaid.

- 4 -

SHAFLAND-001161

Notwithstanding the Lessee's insurance obligations hereinabove, Lessee agrees to defend and save Lessor harmless from any liability, cost or expense, including cost of defense that would otherwise be covered by the insurance required to be maintained herein.

At all times during the term of this Lease, Lessee, at Lessee's sole cost and expense, shall provide and maintain in favor of Lessor as the insured, insurance on the Building, machinery, boilers and equipment therein owned by the Lessor (excluding any property the Lessee is required to insure), in the amount equal to one hundred percent (100%) of the full replacement value thereof (exclusive of costs of excavation, foundations and footing below ground level) against loss by fire and extended coverage. Such insurance shall be issued by a Company and in form approved by Lessor and shall name Lessor and any mortgagee as additional insureds. The Lessor will carry public liability and property damage insurance with respect to the operation of the Leased Premises in reasonable amounts as would be carried by a prudent owner. The Lessor may obtain other insurance as the Lessor or its mortgagee (if any) may determine advisable.

## 9.
## Repairs

Lessee shall be responsible only to maintain the non-structural portions of the interior of the Leased Premises in good repair and condition, ordinary wear and tear excepted. At the termination of this Lease, Lessee shall return the Leased Premises to Lessor, in like order and condition as received, broom clean and free from trash, ordinary decay, wear and tear, acts of God, terrorism, casualty, civil disorder and other conditions beyond Lessee's reasonable control excepted, and shall deliver the keys to the Leased Premises to Lessor.

Lessor shall be responsible at its sole cost and expense to maintain in good order, replace and perform repairs to all parking areas, the trunk lines of the electrical and plumbing system, exterior, roof, roof system and components, foundation, slab floor, and structural elements of the Leased Premises. Lessee shall be responsible for maintaining all electrical and plumbing lines within the Building beyond the main trunk lines, as well as any lighting, heating and air-conditioning equipment. Maintenance of all electrical or plumbing fixtures in the Building, whether installed by Lessor or Lessee, shall become the sole responsibility of the Lessee for the term of this Lease. If Lessor fails to make such repairs or replacements promptly or within 15 days of occurrence, Lessee may, at its option, make such repairs or replacements and Lessor shall repay the costs therof to Lessee on demand.

- 5 -

SHAFLAND-001162

## 10.
### Indemnification

Except for Lessor, or its employees, agents, representatives or contractors' negligence or willful misconduct, or Lessor's failure to perform its obligations hereunder, Lessee shall indemnify and hold harmless Lessor from and against any and all claims, liabilities, expenses, losses and damages arising from Lessee's use of the Leased Premises, or from the conduct of Lessee's business, or from any activity, work or things done by Lessee in or about the Leased Premises and shall further indemnify and hold harmless Lessor from and against any and all claims arising from any breach or default in the performance of any obligation on Lessee's part to be performed under the terms of this Lease, or arising from any negligence of the Lessee, or any of Lessee's agents, contractors, or employees and from and against all costs, reasonable attorney's fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon, and in case any action or proceeding be brought against Lessor by reason of any such claim, Lessee upon notice from Lessor, shall defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor.

Except for Lessee, or its employees, agents, representatives or contractors' negligence or willful misconduct, or Lessee's failure to perform its obligations hereunder, Lessor shall indemnify and hold harmless Lessee from and against any and all claims, liabilities, expenses, losses and damages arising from any breach or default in the performance of any obligation on Lessor's part to be performed under the terms of this Lease, or arising from any negligence of the Lessor, or any of Lessor's agents, contractors, or employees and from and against all costs, reasonable attorney's fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon, and in case any action or proceeding be brought against Lessee by reason of any such claim, Lessor upon notice from Lessee, shall defend the same at Lessor's expense by counsel reasonably satisfactory to Lessee.

Pursuant to this Section 16, the Lessor and Lessee hereby provide that all parties hereto shall be subject to and have the benefit of the provisions of La. R.S. 9:3221.

In addition, Lessee waives those rights of Warranty against Vices or Defects expressed in Civil Code Articles 2696 and 2697, it being further expressly acknowledged by Lessee that Lessor has not had possession of the Leased Premises and that Lessee has owned or occupied the Leased Premises for 3 months preceding this Lease.

## 11.
### Alterations or Additions by Lessee

Except as herein otherwise provided for, all alterations, replacements, additions

- 6 -

and improvements made upon the Leased Premises by Lessee, including all component parts thereof ("Lessee's Improvements"), shall be done at Lessee's sole expense, but only with the prior express written consent of Lessor, which consent shall not be unreasonably withheld, exercised, conditioned or delayed.

Lessee shall furnish plans and specifications incorporating Lessee's Improvements ("Plans and Specifications") for Lessor's prior approval. Notwithstanding the foregoing, failure of Lessor to approve plans for any improvements, alterations or additions within seven (7) business days of receipt shall conclusively be deemed approval of said plans. The approval by Lessor of the Plans and Specifications shall not constitute the assumption of any liability on the part of Lessor for their compliance or conformity with applicable building codes and the requirements of this Lease or for their accuracy, and Lessee shall be solely responsible for such Plans and Specifications. In addition, the approval by Lessor of the Plans and Specifications shall not constitute a waiver by Lessor of the right to thereafter require Lessee to amend the same to provide for any corrections or omissions by Lessee of items required by building codes or this Lease which are later discovered by Lessor.

All heating, ventilating, and air conditioning equipment, plumbing fixtures, electrical panels and installations, carpeting, floor coverings, ceiling fans, window treatments, light fixtures, hot water heaters, and other such equipment relating to the mechanical systems of the improvements constructed by Lessee on the Leased Premises or otherwise attached thereto or forming its component parts within the meaning of La. Civ. Code art. 466 (collectively, the "Component Parts"), whether placed on the improvements at the beginning of the term or thereafter, shall constitute part of the improvements and shall become Lessor's property at the end of the Term of this Lease without any obligation on the part of Lessor to reimburse Lessee or any other person or entity therefor. Lessor acknowledges and agrees that all trade fixtures, machinery, equipment, bottle manufacturing equipment, furniture, signs or other personal property other than Component Parts (hereinafter such personal property not constituting Component Parts is referred to collectively as the "Equipment") of whatever kind and nature installed or affixed and thereafter kept or installed on the Leased Premises by Lessee or sublessee, shall not become the property of Lessor or a part of the realty no matter how affixed to the Leased Premises, and may be removed by Lessee or sublessee, in its discretion, at any time and from time to time during the entire term of this Lease and any extension thereof, provided that Lessee or sublessee shall repair any damages caused by such removal and, if removed at the end of the Term of this Lease that the Leased Premises are returned to the same condition as when let, ordinary wear and tear, acts of God, terrorism, casualty, civil disorder and other conditions beyond Lessee's reasonable control excepted.

Upon request of Lessee, Lessor shall execute and deliver, in a form reasonably

- 7 -

acceptable to Lessor, Lessor's Waiver forms submitted by any vendor, lessor, chattel mortgagee, lender secured by a security interest in, owner or holder of the Equipment or other personal property of Lessee or sublessee kept or installed on the Leased Premises by Lessee or sublessee, setting forth that Lessor subordinates in favor of such vendor, lessor, chattel mortgagee, lenders, owner or holder, any lien claim, interest or other right therein superior to that of such vendor, lessor, chattel mortgagee, lenders, owner or holder. Lessor shall further acknowledge that Equipment or other personal property covered by such Lessor's Waiver forms is personal property and is not to become part of the realty no matter how affixed thereto and that such property may be removed from the Leased Premises by the vendor, lessor, chattel mortgagee, lenders, owner or holder at any time upon default by the Lessee or sublessee in the terms of such chattel mortgage, security agreement or other similar documents, free and clear of any claim or lien of Lessor, provided that Lessee or sublessee shall repair any damages caused by such removal.

## 12.
## Public Authorities

Lessor warrants, that on the commencement day of the Lease, the Leased Premises will comply with all applicable laws, ordinances, rules and regulations of governmental authorities ("Applicable Law").  After commencement of the Lease, Lessee shall comply with all Applicable Laws, ordinances, rules and regulations of governmental authorities relating to the Leased Premises and the use and occupancy thereof.

## 13.
## Signs by Lessee

Subject to Lessor's prior written approval, which approval shall not be unreasonably withheld, exercised, conditioned or delayed, Lessee shall have the right to erect and maintain signs advertising Lessee's business on the interior and exterior of the Leased Premises, provided that such signs shall be erected and maintained in accordance with the rules and regulations of the properly constituted authorities.  Lessee shall remove all such signs at the expiration of this Lease and shall repair any damage to the Leased Premises caused by the erection, maintenance or removal thereof.

## 14.
## Entry by Lessor

Lessor shall have the right upon reasonable notice, except in case of emergency, to enter the Leased Premises at all reasonable times for the purpose of inspecting the same, to make repairs and alterations, provided Lessor will not unduly inconvenience Lessee's business.

- 8 -

SHAFLAND-001165

## 15.
### Quiet Possession

Lessee shall be entitled to continuous, uninterrupted, quiet and peaceful possession of the Leased Premises so long as Lease is not in default.

## 16.
### For Sale and For Rent Signs Inspection by Prospects

Lessor shall have the right to place the usual "For Sale" sign on the Leased Premises at any time during the term of this Lease and the usual "For Rent" sign on the Leased Premises during the last three (3) months of the term of this Lease, or any option period, assuming Lessee does not exercise its option to renew. Such signs shall not unreasonably detract from the image of the Building or cover any doors or windows to the Leased Premises. Lessee agrees to allow persons authorized by Lessor to inspect the Leased Premises during (i) the term of this Lease or any option period with the view of purchasing the same and (ii) during the last three (3) months of the term of this Lease with the view of renting the same, such inspections to be at reasonable hours and upon 24 hour notice (which may be verbal).

## 17.
### Surrender of Possession

Upon expiration or termination of this Lease, Lessee shall surrender possession of the Leased Premises immediately to Lessor in good order and condition clear of all personal property and broom cleaned and shall repair all damages to the premises, usual wear and tear, acts of God, terrorism, casualty, civil disorder and other conditions beyond Lessee's reasonable control excepted. Any holding over by Lessee shall not operate, except by written agreement, to extend or renew this Lease, but in such case, Lessor may terminate Lessee's occupancy at once or may consider such occupancy to be from month to month.

## 18.
### Subleasing or Assignment

Lessee shall not assign, sublease or otherwise transfer the Lease, or any right or interest in the Lease or in the Leased Premises, without the prior written consent of Lessor, which consent shall not be unreasonably withheld, conditioned or delayed. Financial strength of the proposed sublessee or assignee shall be a consideration and Lessor may reject such proposed sublessee or assignee on these grounds. Notwithstanding the foregoing or anything in this Lease to the contrary, Lessor hereby

- 9 -

SHAFLAND-001166

agrees that Lessee may, without the prior notice to or consent of Lessor, assign this Lease to: (i) an entity controlled by, controlling or under common control of Lessee's parent corporation; or (ii) an entity acquiring or succeeding to substantially all of the business, or substantially all of a business unit, of Lessee, by merger, spin-off, reorganization, consolidation, acquisition (of assets or equity) or otherwise. Notwithstanding anything in this Lease to the contrary, Lessor hereby agrees that Lessee may sublease any portion of the Leased Premises to an approved sublessee for the purpose of installing, maintaining and operating bottle manufacturing equipment used to package the chemicals produced in the Leased Premises. In the event of the assignment, sublease or transfer by Lessee of its interest in this Lease to a person or entity expressly assuming Lessee's obligations under this Lease, Lessee shall thereby be released from any liability for the payment of Rent and for the performance of all other terms, covenants, provisions and obligations of Lessee under the Lease accruing on and after the date of the assignment, sublease or transfer ("Transfer Date"); provided, however, that Lessee shall remain liable for any liabilities or obligations accruing under the Lease prior to the Transfer Date, but only to the extent the same have not been complied with or satisfied in full prior to the Transfer Date.

## 19.
### Auction or Other Sales

No auction sales or other sales not in the ordinary course of Lessee's business shall be conducted on the Leased Premises, without the prior written consent of Lessor.

## 20.
### Damage by Fire or Other Casualty

Lessee shall give Lessor immediate notice of any damage to the Leased Premises caused by fire or other casualty. Lessor shall notify Lessee within thirty (30) days after such casualty of Lessor's intent to repair and the estimate length for such repairs and renovations. If the Leased Premises or the Building is damaged by fire the elements, unavoidable accident or other cause or casualty as to be rendered untenable in whole or in part and necessary repairs can not be made within 120 days of the casualty, this Lease shall terminate as of the time of the Leased Premises or the Building were rendered untenable. However, if the damage is such that same can be repaired within a period of one hundred twenty (120) days of the casualty, Lessor agrees to make such repairs promptly at its own expense, and to allow Lessee an abatement in rent for such time as the Leased Premises remains untenable. During the restoration period, Lessor shall use commercially reasonable efforts to provide Lessee with any temporary accommodations or services that Lessee may require to continue operating at the Leased Premises,

- 10 -

SHAFLAND-001167

including without limitation, utility services.  Notwithstanding the foregoing, if in Lessee's reasonable opinion Lessee is unable to use the Leased Premises to conduct its business during the restoration period, and Lessee does in fact cease operating at the Leased Premises during the restoration period, then rent shall be abated in its entirety until the restoration of the Leased Premises has been completed or Lessee resumes operating at the Leased Premises, whichever occurs first.  If the Lease is not terminated pursuant to the termination rights granted hereunder, and Lessor's reconstruction or repair of the Leased Premises is not completed within 120 days of the casualty (subject to unexpected delays due to inclement weather, unexpected delays in the time required to prepare plans for reconstruction, to obtain building permits, and to complete the likely contract bidding process and all other relevant factors, but not to exceed an additional sixty (60) days), then Lessee shall have the right to terminate this Lease by written notice to Lessor delivered within thirty (30) days after the expiration of the 120 day restoration period (or as so extended), whereupon both parties shall be relieved of all further obligations hereunder, except as otherwise expressly set forth herein.

Notwithstanding the foregoing, if a portion of the Parking Area is damaged or destroyed by casualty, and as a result Lessee is unable to access the Leased Premises or otherwise use the Leased Premises as intended herein, the parties agree that: (i) Lessor shall use commercially reasonable efforts to provide Lessee with any temporary accommodations or services that Lessee may require to continue operating at the Leased Premises, including without limitation, temporary truck access and parking, (ii) if Lessee is unable to use the Leased Premises as intended, or if such use is adversely impacted, the rent due hereunder shall be equitably reduced as agreed upon by the parties until such time as the Parking Areas are restored or Lessor provides satisfactory alternate accommodations to Lessee (in Lessee's sole reasonable opinion), and (iii) if the parties are unable to reach agreement on the reduced rent within sixty (60) days after the date of the casualty, or Lessee is unable to reasonably use the Leased Premises for a period of one hundred twenty (120) days after the date of such casualty, then Lessee may elect to terminate this Lease with written notice to Lessor.

If the loss occurs in the last 18 months of the Term or extension thereof, either party may terminate this Lease effective the date of the casualty by giving the other party written notice of such election within 30 days of the casualty.  In the event of partial loss or damage, the rent shall be abated by the proportion of the Leased Premises rendered unfit for use or safe tenancy.

### 21.
### Default

If Lessee fails to pay any installment of rent due under this Lease or fails to comply with any other provision of this Lease, within ten (10) days after written notice by Lessor to Lessee demanding same, provided that said written notice need not be given with

- 11 -

SHAFLAND-001168

regard to nonpayment of rent after such notice has been given twice during any calendar year, or if Lessee abandons the Leased Premises or abandons the Leased Premises or removes from the Leased Premises any property against which Lessor is entitled to a Lessor's lien or makes an assignment for the benefit of creditors or is adjudged a bankrupt in an involuntary bankruptcy proceeding or files any type of proceeding or applies for any relief under the laws of the United States relating to bankruptcy or State laws relating to insolvency or if a receiver or other custodian is appointed for Lessee for any of Lessee's property by any court, or if Lessee shall fail to perform any other obligation or to comply with any other provision of this Lease, and such default shall continue for a period of thirty (30) days after written notice therefor from Lessor to Lessee, then, in any such event, Lessor shall have the right, at Lessor's option, without putting Lessee in default and without notice of default, (1) to cancel this Lease effective immediately or effective as of the date Lessor may select or, (2) to proceed one or more times for past due installments of rent only, without prejudicing the right to proceed later for additional installments or exercise any other remedy, or (3) to declare the unpaid rent for the entire unexpired term of this Lease immediately due and payable and at once demand and receive payment thereof or, (4) to have recourse to any other remedy or mode of redress to which Lessor may be entitled by law.  In the event Lessor exercises the right to cancel this Lease, then (a) Lessor shall have the right, as soon as said cancellation is effective, to re-enter the Leased Premises and re-let the same for such price and on such terms as may be immediately available, and (b) Lessee shall be and remain liable not only for all rent payable to the date such cancellation becomes effective, but also for all damage or loss suffered by Lessor for the remaining term of this Lease resulting from such cancellation.  Failure of Lessor to exercise any right granted in this Paragraph shall not be construed as a waiver of the right to subsequently enforce for a new default such right and no indulgence by Lessor shall be construed as a waiver of any right herein granted.

Notwithstanding any other provisions of this Lease, where the curing of an alleged default requires more than payment of money, and the work of curing said default cannot reasonably be accomplished within the time otherwise permitted herein, and where Lessee has commenced upon the work of curing said default and is diligently pursuing same, then Lessee shall be entitled to reasonable time extensions to permit the completion of the work of curing said default, as a condition precedent to any re-entry or termination, and any defect so cured shall not thereafter be grounds for default.

Notwithstanding any of the terms and provisions herein contained to the contrary, Lessor and Lessee shall each have the duty and obligation to mitigate, in every reasonable manner, any and all damage that may be caused or suffered by virtue of defaults under or violation of any of the terms and provisions of this Lease committed by the other, exercising sound business practices.

- 12 -

SHAFLAND-001169

**22.**
**Attorney's Fees**

In the event it becomes necessary for Lessor or Lessee to employ an attorney to enforce collection of the rents and other amounts agreed to be paid, or to enforce compliance with any of the covenants and agreements herein contained, the defaulting or breaching party shall pay all reasonable attorney's fees, costs and expense occasioned by such default(s) or breach (es).

**23.**
**Sale of Leased Premises, Release of Lessor on Sale**

Lessor is freely permitted, subject to the Right of First Refusal in favor of Lessee, to transfer the Leased Premises, this Lease and Lessor's rights under this Lease. Upon a sale or transfer of the Leased Premises, by Lessor or a subsequent purchaser or transferor thereof, the purchaser or transferee by virtue of such sale or transfer shall be bound for the performance of all Lessor's agreements and obligations under this Lease and the vendor or transferor shall thereupon be released from any and all liability thereafter arising under this Lease.

**24.**
**Right of First Refusal**

If at any time during the term of this Lease, Lessor desires to sell, convey or otherwise transfer all or any interest in the Property and/or Leased Premises and receives a bona fide offer from a prospective purchaser, Lessor shall notify Lessee in writing ("Lessor's Notice") of the terms and conditions of such offer. The Lessee shall have the right of first refusal to purchase the Property and/or Leased Premises on the same terms and conditions as the bona fide offer from the prospective purchaser, by notifying Lessor of its intent to so acquire the Property and/or Leased Premises within ten (10) business days after the receipt of Lessor's Notice. If at the end of said ten (10) business day period, Lessee fails to notify the Lessor of its election to purchase the Property and/or Leased Premises, Lessor may sell the Property and/or Leased Premises (subject to the rights of the Lessee pursuant to the terms of this Lease), provided such sale is fully completed within 180 days after receipt of the Lessor's Notice. If such sale is not fully completed within said 180 days, Lessor shall again provide Lessor's Notice and Lessee shall have the right to purchase as provided herein.

- 13 -

SHAFLAND-001170

## 25.
### Notices

Any notice, demand, request, document or other act of communication required or permitted to be given under this Lease shall be in writing and may be delivered in person or shall be deemed to be delivered when sent by United States Certified or Registered Mail, postage prepaid, return receipt requested, or by reliable overnight carrier such as Federal Express and addressed to the parties hereto at their respective address as designated herein or at such other address as either party may from time to time direct, by written notice in accordance herewith.

Lessor:     SHAF-LAND, L.L.C.
            12717 Hooper Road
            Baton Rouge, Louisiana 70868
            Attention: Manager

Lessee:     Sunbelt Chemicals Corp.
            71 Hargrove Grade
            Palm Coast, Florida 32137
            Attention: President

## 26.
### American with Disabilities Act (ADA)

Lessee hereby represents that it is a public accommodation as defined in the ADA. Upon commencement of the Lease, the Lessee at its sole cost and expense shall be solely responsible for taking any and all measures which are required to comply with the requirements of Title I and/or Title III of the ADA within Lessee's Leased Premises. Any alterations to the Leased Premises made by Lessee for the purpose of complying with the ADA or which otherwise require compliance with the ADA shall be done in accordance with this Lease; provided, that Lessor's consent to such alterations shall not constitute either Lessor's assumption, in whole or in part, of Lessee's responsibility for compliance with the ADA, or representation or confirmation by Lessor that such alterations comply with the provisions of the ADA.

Lessee shall indemnify the Lessor for all claims, damages, judgments, penalties, fines, administrative proceedings, costs, expenses and liability arising from Lessee's failure to comply with any of the requirements of Title I and/or Title III of the ADA within Lessee's Leased Premises.

- 14 -

Lessor shall indemnify the Lessee for all claims, damages, judgments, penalties, fines, administrative proceedings, costs, expenses and liability arising from Lessor's failure to comply with Title III of the ADA within the common areas.

## 27.
## Miscellaneous

Failure of Lessor to require strict performance by Lessee of any of the covenants, provisions or conditions of this Lease, on one or more occasions, shall not constitute a waiver by Lessor of the right thereafter to require strict compliance with said covenants, provisions and conditions.

## 28.
## Governing Law

This Lease shall be deemed to be a contract made under the laws of the State of Louisiana and shall be construed in accordance with and governed by the laws of the State of Louisiana and ordinances of the municipality and parish where the Leased Premises is situated and the rules and regulations of their duly constituted authorities.

## 29.
## Recording

Recording of the Lease is prohibited except as allowed in this paragraph. At the request of either party, the parties shall promptly execute and record, at the cost of the requesting party, an extract of the Lease in accordance with La. R.S. 44:104.

## 30.
## Subordination/Non-Disturbance

Lessor agrees to furnish Lessee with a non-disturbance agreement as hereinafter provided with respect to any mortgage which presently or any time in the future encumbers the premises within ten (10) days after the execution of this Lease or any such mortgage, whatever the case may be. Lessee agrees that this Lease shall at all times be subject and subordinate to the lien of any mortgage that now or hereafter encumbers or affects the Leased Premises and to all renewals, modifications, consolidations, replacements and extensions thereof; provided, however, as a condition to this subordination provision, the Lessor shall obtain from any such mortgagee an agreement in writing, in recordable form acceptable to Lessee, providing in substance that, so long as a default has not occurred under the Lease, , such mortgagee will not disturb Lessee's possession, deprive Lessee of any rights or increase Lessee's obligations under the Lease, nor shall this Lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchase at such foreclosure

- 15 -

SHAFLAND-001172

sale, or who acquires title to the Building as a result of such enforcement, shall be bound to Lessee for the terms of this Lease, the rights of Lessee hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect; provided, however, that Lessee fully performs all of its obligations hereunder.

Both parties agree that if called upon by the other each will, within ten (10) days of prior written request of either party, execute an estoppel certificate identifying this Lease, and acknowledging the status of the performance of the requesting party's obligations under this Lease as of the date of such estoppel certificate.

## 31.
## Condemnation

If all of the Leased Premises are taken by condemnation or eminent domain proceedings, or if so much of the Leased Premises are so taken that the remainder is inadequate for Lessee's business purposes, this Lease shall terminate.   In such condemnation proceedings, Lessee may claim compensation for moving expenses and for the taking of any removable installations which by the terms of this Lease Lessee would be permitted to remove at the expiration of this Lease, if such award is separately allowed by the condemning authority, but Lessee shall be entitled to no additional award, and Lessee hereby waives all rights to proceeds for, the loss of its leasehold interest, it being agreed that all damages recoverable by reason of the value of the Leased Premises will belong and be payable to the Lessor.

## 32.
## Review of Documents

Notwithstanding any provision to the contrary in this Lease, the parties hereto acknowledge that (1) they have reviewed this Lease in detail prior to execution of same, and (2) they have had the opportunity to review this Lease with their respective counsel.

## 33.
## Conflicting Provisions

If there is any conflict between the printed portions and the typewritten or handwritten portions of this Lease, the typewritten or handwritten portions shall prevail.

- 16 -

SHAFLAND-001173

## 34.
### Effect of Provisions

All of the provisions contained herein, shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, executors, administrators, successors and assigns. If any section, paragraph, sentence or portion of this Lease or the application thereof to any party or circumstance shall, to any extent, be or become invalid or illegal, such provision is and shall be null and void, but, to the extent that said null and void provisions do not materially change the overall agreement and intent of this entire Lease, the remainder of this Lease shall not be affected thereby and each remaining provision of this Lease shall be valid and enforceable to the fullest extent provided by law.

## 35.
### Entire Agreement

The whole agreement between the parties hereto is set forth in this instrument and they shall not be bound by any oral or written agreements, conditions, understanding or representations other than are expressly stipulated and set forth herein or in any amendments hereto. Any amendments or other changes to the terms and conditions to this Lease are to be in writing and signed by the parties hereto.

LESSOR:
SHAF-LAND, L.L.C.,
a Louisiana limited liability company

By: _Richard D. Shaffett_
Name: _Richard D. Shaffett_
Title: _manager_

LESSEE:
Sunbelt Chemicals Corp.,
a South Carolina Corporation

By: _____
Name: _R. Patricia Weston_
Title: _Secretary_

- 17 -

Exhibit A
Legal Description

One certain tract or parcel of land, together with all buildings and improvements thereon and all rights, ways, privileges and appurtenances thereunto belonging, containing 10.50 acres, lying and forming portions of Sections 57, 58 and 59, T-7-S, R-12-E, and Section 50, T-6-S, R-12-E, Ward 4, West Baton Rouge Parish, Louisiana, and being a portion of the property known as the Poplar Grove Plantation. Said tract of land herein conveyed being designated as TRACT PGP-1A-2 on the plat of survey prepared by Joseph Garrett, R.L.S., dated November 20, 1995, entitled, "MAP SHOWING SURVEY OF TRACT PGP-1A-1 AND TRACT PGP-1A-2 BEING THE RESUBDIVISION OF TRACT PGP-1A, FORMERLY A PORTION OF POPLAR GROVE PLANTATION LYING WEST OF LOUISIANA HIGHWAY ONE (1) LOCATED IN SECTION 50, T-6-S, R-12-E, AND SECTIONS 57, 58 AND 59, T-7-S, R-12-E, SOUTHEASTERN LAND DISTRICT WEST OF THE MISSISSIPPI RIVER, WEST BATON ROUGE PARISH, LOUISIANA FOR DISCOVERY INDUSTRIAL DEVELOPMENT CORPORATION", and further shown on Map Showing Boundary Survey with Improvements of Tract PGP-1A-2 of Poplar Grove Plantation for Sunbelt Chemicals II, LLC prepared by Patin Engineers and Surveyors, Inc. (Cletus Langlois, PLS) dated December 4, 2007 (Job No. 07-207) ("the Property").

SUBJECT TO AND INCLUDING ALL BENEFITS OF : (1) A predial servitude and covenant to run with the land, as a perpetual servitude of access from Safe Energy Drive, in favor of Tract PGP-1A-1, designated as "25' Servitude of Access" on the western boundary of the tract conveyed herein, more particularly shown and described on the Garrett plat of survey hereinabove referred to; (2) A predial servitude and covenant to run with the land, as a perpetual servitude of access being a portion of Safe Energy Drive, in favor of Tract PGP-1A-1 and Tract PGP-1B, and such other properties as per agreements of record and/or as may be granted by vendor, designated as "70' Access Road Servitude" on the northern boundary of the tract conveyed herein, more particularly shown and described on the plat of survey hereinabove referred to; and (3) all servitudes and easements as shown on the above described plat of survey; and (4) This description includes a predial servitude and covenant to run with the land for the non-exclusive use of that certain "50' Railroad Spur Servitude" as is more particularly shown and described on plats of survey hereinabove described and in the public records of West Baton Rouge Parish, Louisiana and further includes a predial servitude and covenant to run with the land for the non-exclusive use of Safe Energy Drive as is more particularly shown and described on the plats of survey hereinabove described and in the public records of West Baton Rouge Parish, Louisiana; and (5) Including, all rights in favor of the Property as granted under Road Right of way and Servitude Agreement filed of record on March 19, 1987, at COB 221, page 161, Official Records of West Baton Rouge Parish, LA, as amended at act filed of record on September 3, 1987, at COB 228, page 24; and (6) Including all rights in favor of the Property as granted under Predial Servitude

- 18 -

and Boundary Agreement filed of record on July 27, 1994, at COB 320, page 154, Official Records of West Baton Rouge Parish, LA (herein collectively referred to as the "Property".)

- 19 -

SHAFLAND-001176

## EXTRACT OF LEASE

Pursuant to Louisiana R.S. §44:104, the parties hereto, for the purposes of giving record notice of that certain Lease dated April 4, 2008, (the "Lease"), between SHAF-LAND, L.L.C., a Louisiana limited liability company ("Lessor"), and Sunbelt Chemicals Corp., a South Carolina corporation ("Lessee"), hereby set forth the following:

1.　　**Lessor:**　　SHAF-LAND, L.L.C., a Louisiana limited liability company.

2.　　**Lessee:**　　Sunbelt Chemicals Corp., a South Carolina corporation.

3.　　**Date of Execution of Lease:** Lease dated April 4, 2008;

4.　　**Description of Leased Property:**

Three (3) buildings containing a total of approximately 75,700 rentable square feet having a street address of 1259 Safe Energy Drive, Port Allen, Louisiana 70767, together with any parking spaces or areas serving the property

5.　　**Primary Term of Lease:** The Primary Term of the Lease shall commence on April 4, 2008 and shall run for a period ending April 3, 2015.

6.　　**Renewal Options:** Lessee shall have the option(s) to extend the term of this Lease for (2) consecutive extended term(s), the first extended term shall be for a period of two (2) years, and the second extended term shall be for a period of three (3) years.

7.　　**Option to Purchase:** The Lease contains a right of first refusal for the Lessee to purchase the Leased Premises during the lease term, subject to the conditions set forth in the Lease.

8.　　**Incorporation of Lease:** This Extract is for informational purposes, and nothing contained herein shall be deemed in any way to modify or otherwise affect the terms or conditions of the Lease. All terms and conditions of the Lease are hereby incorporated herein by reference. In the event of any inconsistency between the terms of the Lease and this Extract, the terms of the Lease will control.

SUNBELT_ Extract of Lease (2)

**IN WITNESS WHEREOF,** Lessor and Lessee have executed this Extract of Lease to be effective as of April 4, 2008.

WITNESSES FOR LESSOR:

(1) _____

    SAMUEL A. BACOT

(2) _____

    CINDy N. Shotwell

SHAF-LAND, L.L.C.,
a Louisiana limited liability company

By: _____

Name: Richard D. Shaffett

Title: manager

WITNESSES FOR LESSEE:

(1) _____

(2) _____

SUNBELT CHEMICALS CORP.,
a South Carolina corporation

By: _____

Name: R. Patrick Weston

Title: Secretary

STATE OF LOUISIANA
PARISH OF WEST BATON ROUGE
I HEREBY CERTIFY that the within and foregoing is
true and correct copy of the original as recorded on the _____ day of
_____ 2008, in Book _____ 460 ____ Page _____
Entry Number _____ 0020 ____ 844.1 ____ of the Records of
West Baton Rouge Parish Louisiana, at _____ M., _____ P.M.
IN FAITH WHEREOF, Witness my hand and the impression
of the seal of my said office at Port Allen, Louisiana, on this _____
day of _____ AD, 2008
_____ DEPUTY CLERK OF COURT

SHAFLAND-001178

| **From:** | Veronica Pryor |
|---|---|
| **To:** | Tim@sunbeltchemicals.com |
| **Cc:** | Phillip Foco |
| **Subject:** | SHAF-LAND, LLC - leased property at 1259 Safe Energy Drive, Port Allen, Louisiana 70767 |
| **Date:** | Tuesday, May 05, 2015 12:23:33 PM |
| **Attachments:** | 050515 ltr to Sunbelt Chemicals.pdf |
| | 050515 ltr to Larussa.pdf |
| | 050515 ltr to ACE American Insurance Company.pdf |
| | 050515 ltr to Wells Fargo.pdf |

Mr. Capp,

Please see the attached correspondence being mailed today with regards to SHAF-LAND, L.L.C.

Thanks,

Veronica Pryor
Legal Assistant to Phillip E. Foco
And Katie D. Chabert
**Bienvenu, Bonnecaze, Foco, Viator & Holinga**
4210 Bluebonnet Boulevard
Baton Rouge, LA 70809
Telephone: (225) 388-5610
Fax: (225) 388-5622
veronica.pryor@bblawla.com
http://www.bblawla.com

CONFIDENTIALITY MESSAGE Privileged: This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the specific individual or entity named above. If you or your employer is not the intended recipient of this e-mail or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any unauthorized dissemination or copying of this e-mail is strictly prohibited. If you have received this transmission in error, please immediately delete the message.

CIRCULAR 230: Pursuant to federal tax regulations imposed on practitioners who render tax advice ("Circular 230"), we are required to advise you that any advice contained in this communication regarding federal taxes is not written or intended to be used, and cannot be used, by any person as the basis for avoiding federal tax penalties under the Internal Revenue Code, nor can such advice be used or referred to for the purpose of promoting, marketing or recommending any entity, investment, plan or arrangement.



**CONFIDENTIAL**              **SUNBELT  000695**



**BIENVENU BONNECAZE FOCO APLLC & VIATOR HOLINGA**

*PHILLIP E. FOCO*
*Partner*

*225.388.5603 (Direct)*
*225.388.5622 (Fax)*
*phillip.foco@bblawla.com*

May 5, 2015

ACE American Insurance Company          **Via Certified Mail**
Through its Agent for Service of Process:    *Article No. 7014 2120 0002 6446 6108*
Louisiana Secretary of State
8585 Archives Avenue
Baton Rouge, LA 70809

Re:    SHAF-LAND, L.L.C.
       Leased property at 1259 Safe Energy Drive, Port Allen, Louisiana 70767

Dear Sir:

My firm has been retained by SHAF-LAND, L.L.C. in connection with certain damage caused to its property that is located at 1259 Safe Entergy Drive, Port Allen, Louisiana 70767, which property was subject to a Commercial Lease executed by and between SHAF-LAND, L.L.C. and your insured, Sunbelt Chemicals Corp. As you will see from the attached correspondence and exhibits (on CD), Sunbelt's operations on the leased premises caused extensive damage to the Leased Premises. It has come to our attention that you have issued a policy or policies that provide coverage for all or part of the damage caused by Sunbelt's operations. Although there may be additional policies issued by you that provide coverage for some or all of the damages in question, it would appear that, at the very least, Policy No. EPRN0194423A issued on May 1, 2007 is applicable to the current dispute. As mentioned above, we have attached for your review a copy of the Commercial Lease executed between SHAF-LAND, L.L.C. and Sunbelt Chemical Corp, ACE American Insurance Company Policy No. EPRN0194423A, correspondence dated February 13, 2015 and May 5, 2015 directed to Sunbelt Chemical Corp along with photographs and other materials attached to said correspondence that depict some of the damage for which we are seeking recovery on behalf of our client, SHAF-LAND, L.L.C.

We hereby make demand under Policy No. EPRN0194423A, and any other applicable policy of insurance, for restoration and/or repair costs occasioned by the operations of your insured, Sunbelt Chemicals Corp. on the Leased Premises.

Very truly yours,

BIENVENU, BONNECAZE, FOCO, VIATOR & HOLINGA, APLLC

Phillip E. Foco

PEF/vp

Enclosure

cc:    Tim Capp (via U.S. Mail)
       Jim Jezewski, Starr Technical Risks Agency, Inc. (via Certified Mail 7014 2120 0002 6446 6122)
       Tim Drag, Middle Market (via Certified Mail 7014 2120 0002 6446 6115)
       The Puckett Group, Inc. (via Certified Mail 7014 2120 0002 6446 6139)

CONFIDENTIAL    SUNBELT 000696



**BIENVENU
BONNECAZE
FOCO** APLLC
**& VIATOR
HOLINGA**

*PHILLIP E. FOCO*
*Partner*

*225.388.5603 (Direct)*
*225.388.5622 (Fax)*
*phillip.foco@bblawla.com*

May 5, 2015

Benny M. Larussa, Jr.
Azalea Capital, L.L.C.
One Liberty Square
55 Beattie Place Suite 1500
Greenville, South Carolina 29601

**Via Certified Mail**
*Article No. 7014 2120 0002 6446 6092*

Re:    SHAF-LAND, L.L.C.
       Leased Property at 1259 Safe Energy Drive, Port Allen, Louisiana 70767

Dear Sir:

       My firm has been retained by SHAF-LAND, L.L.C. in connection with issues relating to the Commercial Lease executed between it and Sunbelt Chemicals Corp. on April 4, 2008, which Commercial Lease is attached hereto as Exhibit "A." It has come to our attention that Sunbelt Chemicals Corp. is an asset/subsidiary of Azalea Capital, L.L.C. I attach for your review as Exhibit "B" correspondence that has been directed to Sunbelt over the past few months concerning extensive property damage caused by its operations under the Commercial Lease referenced above. To date, no response whatsoever has been received from Sunbelt. To make matters worse, Sunbelt has refused to pay the last monthly rental due under the Commercial Lease or to provide any response whatsoever to the various inquiries of either this office or my client. Considering Azalea's relationship with Sunbelt, I would assume that you would appreciate receiving timely notice of these issues. Please understand that while we would like to resolve these issues amicably, we do intend to seek the appropriate relief in a court of law if that cannot be accomplished.

Very truly yours,

BIENVENU, BONNECAZE, FOCO, VIATOR & HOLINGA, APLLC

Phillip E. Foco

PEF/vp

Enclosures

cc:    Tim Capp (via U.S. Mail)

CONFIDENTIAL    SUNBELT 000697

*oris*

# COMMERCIAL LEASE

THIS COMMERCIAL LEASE is entered into effective as of the 4th day of April, 2008 ("Effective Date"), by and between **SHAF-LAND, L.L.C.**, a Louisiana limited liability company ("Lessor") and Sunbelt Chemicals Corp., a South Carolina corporation ("Lessee") who agree as follows:

## 1.
### Parties and Leased Premises

This Commercial Lease (the "Lease") is made by and between SHAF-LAND, L.L.C., a Louisiana limited liability company ("Lessor") and Sunbelt Chemicals Corp., a South Carolina corporation ("Lessee"). Lessor owns, operates or controls certain real property situated in the City of Port Allen, West Baton Rouge Parish, State of Louisiana, which real property (the "Property") is more particularly described on Exhibit A attached hereto. Lessor hereby leases to Lessee three (3) buildings (collectively the "Building") located at the Property containing a total of approximately 75,700 rentable square feet and having a street address of 1259 Safe Energy Drive, Port Allen, Louisiana 70767, together with any parking spaces or areas serving the Property (the "Parking Area(s)"), any driveways, the land upon which they are located and all other buildings and improvements thereon are herein collectively referred to as the "Leased Premises".

## 2.
### In Solido Liability

If the above described property is leased to more than one party, the obligations of all such parties hereunder, as Lessee, shall be in solido.

## 3.
### Term

The "Commencement Date" of this Lease is April 4, 2008. Unless extended or earlier terminated in accordance with the provisions herein, the primary term of this Lease is for a period of seven (7) years and shall begin on the Commencement Date and end on April 3, 2015.

Lessee shall have the option(s) to extend the term of this Lease for (2) consecutive extended term(s), the first extended term shall be for a period of two (2) years, and the second extended term shall be for a period of three (3) years, provided that the Lease is in full force and effect and no material defaults exist under the Lease at the time of such extension. Lessee shall give written notice of its exercise of the respective option at least

- 1 -

CONFIDENTIAL

SUNBELT 000698



ninety (90) days prior to the expiration of the original term or the expiration of the then existing term.  Each extension term shall be upon the same terms and conditions and the monthly base rent during each extension term shall be in the amounts set forth in Section 4 below.

### 4.
### Rental and Place of Payment

Beginning on the Commencement Date, Lessee shall pay to Lessor, without demand or request on or before the first day of each month of the Term, monthly base rent ("Rent") in the amounts set forth below.    All payments of rent shall be made to Lessor, at the address designated in that Section titled "Notices" but Lessor may, from time to time, designate other persons and places for payment of rent by notice to Lessee. Any rent payment not received by the 10th of the month shall be considered delinquent, and Lessee agrees to pay to Lessor as a "late charge", an amount as additional rent, equal to five percent (5%)  of the amount past due .  The parties agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such payment. Rent for any partial month of the term of this Lease shall be prorated on a per diem basis.

| Effective Dates | Monthly Base Rent | Annual Base Rent |
|---|---|---|
| Year 1 | $20,979 per month | $251,748 annually |
| Year 2 | $20,979 per month | $251,748 annually |
| Year 3 | $20,979 per month | $251,748 annually |
| Year 4 | $22,079 per month | $264,948 annually |
| Year 5 | $22,079 per month | $264,948 annually |
| Year 6 | $22,079 per month | $264,948 annually |
| Year 7 | $23,151 per month | $277,812 annually |
| Year 8 | $23,151 per month | $277,812 annually |
| Year 9 | $23,151 per month | $277,812 annually |
| Year 10 | $24,224 per month | $290,688 annually |
| Year 12 | $24,224 per month | $290,688 annually |
| Year 13 | $24,224 per month | $290,688 annually |

- 2 -

CONFIDENTIAL            SUNBELT  000699

**5.**

**Utility Charges**

Lessee shall promptly pay all charges for gas, electricity, water, telephone and other utilities, including water sprinkler service charges (if applicable) consumed by Lessee on the Leased Premises, including those used for air-conditioning and heating purposes. All accounts for such utilities shall be carried in the Lessee's name only. The Leased Premises, with electrical power, shall be available to Lessee seven (7) days per week/twenty-four (24) hours per day without additional charge beyond the rent.

**6.**

**Use of Premises**

Lessee shall use the Leased Premises for manufacturing, packaging, marketing and selling of packaged chemicals and other uses incidental thereto, solely for the purpose of carrying out its own business therein, subject to and in accordance with all applicable zoning and other governmental regulations. Lessor hereby further specifically consents to the installation, maintenance and/or operation of the bottle manufacturing equipment and an associated facility by Lessee or its agent in the Leased Premises as an additional permitted use under the Lease. The Lessee and its agents, invitees, guests and employees shall have the exclusive right to the Parking Areas and park vehicles at such Parking Areas overnight. The Leased Premises shall not be used for any unlawful purpose or in any manner that may damage or depreciate the same or the Building. Lessee shall have the right, but shall not be obligated to contest, by appropriate proceedings in the name of the Lessee or Lessor, the validity or application of any law, ordinance, order, rule, regulation or requirement of any nature affecting the Leased Premises and operation of Lessee's business therein.

**7.**

**Tax Responsibility**

Before delinquency, Lessee shall pay taxes assessed during the term of the Lease against inventory, furniture, trade fixtures, apparatus, equipment, or personal property placed by Lessee in the Leased Premises, leasehold improvements installed by Lessee or by Lessor on behalf of Lessee, and any other property of Lessee. Lessor will be responsible for and pay before delinquency any and all payment of all real estate taxes levied against the Leased Premises, Property or Building. Lessee shall reimburse Lessor for the cost of such taxes within thirty (30) days after receiving Lessor's detailed written statement setting forth the amount of such taxes and copies of all invoices and receipts. Lessee's failure to pay within the thirty day period shall entitle Lessor to the same remedies it has upon Lessee's failure to pay rent. Taxes shall be pro rated on a per diem basis for any

- 3 -

**CONFIDENTIAL**          **SUNBELT 000700**

portion of the term of this Lease that occurs during a partial tax year. Nothing contained herein shall prevent Lessor, at its sole cost and expense, from challenging any real estate taxes pursuant to any applicable laws and Lessor hereby agrees that Lessee may, at its sole cost and expense, elect to make such a challenge on Lessor's behalf, and Lessor will reasonably cooperate with any such challenge by Lessee.

## 8.
### Insurance

At all times during the term of this Lease and as part of the consideration for this Lease, Lessee shall provide and maintain, at Lessee's expense, in favor of Lessee as the insured, fire and extended coverage insurance covering Lessee's moveable property, any improvements, alterations or additions made by Lessee to the Leased Premises, any property leased to Lessee within the Leased Premises, and any claims which may arise in connection with the Lessee's operation and use of the Leased Premises.  Lessee shall maintain during the Term Comprehensive General Liability insurance with combined single minimum limits of $1,000,000.00 per occurrence and an aggregate of $2,000,000.00 for bodily injury, personal injury and property damage liability.

The policy providing such insurance shall name Lessor and any mortgagee of the Leased Premises as additional insured and a certificate or verification of insurance, evidencing such insurance, shall be delivered to the Lessor within ten (10) days after the execution of this Lease. Thereafter, all renewals thereof are to be delivered to Lessor at least five (5) business days in advance of the expiration date of the existing policy or policies.

The foregoing insurance shall be carried with a responsible insurance company authorized to transact business in the State of Louisiana.  Lessee shall deliver to Lessor written verification evidencing such insurance in form reasonably acceptable to Lessor, provided that if the Leased Premises are mortgaged during the period of this Lease, such verification shall be delivered to the mortgagee, if requested by the mortgagee.

In the event Lessee should, for any reason whatsoever, fail to keep the Leased Premises so insured or fail to deliver to Lessor, as aforesaid, the certificate or verification of insurance and the renewals thereof, then Lessor, if it so elects, may itself have such insurance effected in such amounts and in such companies as Lessor may deem proper and may pay the premiums therefor and Lessee covenants and agrees that, within five (5) days after payment and demand therefor by Lessor, Lessee shall immediately repay the amount so paid by Lessor as premiums, together with legal interest thereon, from date of such payment until said amount is repaid.

- 4 -

**CONFIDENTIAL**          **SUNBELT  000701**

Notwithstanding the Lessee's insurance obligations hereinabove, Lessee agrees to defend and save Lessor harmless from any liability, cost or expense, including cost of defense that would otherwise be covered by the insurance required to be maintained herein.

At all times during the term of this Lease, Lessee, at Lessee's sole cost and expense, shall provide and maintain in favor of Lessor as the insured, insurance on the Building, machinery, boilers and equipment therein owned by the Lessor (excluding any property the Lessee is required to insure), in the amount equal to one hundred percent (100%) of the full replacement value thereof (exclusive of costs of excavation, foundations and footing below ground level) against loss by fire and extended coverage. Such insurance shall be issued by a Company and in form approved by Lessor and shall name Lessor and any mortgagee as additional insureds. The Lessor will carry public liability and property damage insurance with respect to the operation of the Leased Premises in reasonable amounts as would be carried by a prudent owner. The Lessor may obtain other insurance as the Lessor or its mortgagee (if any) may determine advisable.

## 9.
### Repairs

Lessee shall be responsible only to maintain the non-structural portions of the interior of the Leased Premises in good repair and condition, ordinary wear and tear excepted. At the termination of this Lease, Lessee shall return the Leased Premises to Lessor, in like order and condition as received, broom clean and free from trash, ordinary decay, wear and tear, acts of God, terrorism, casualty, civil disorder and other conditions beyond Lessee's reasonable control excepted, and shall deliver the keys to the Leased Premises to Lessor.

Lessor shall be responsible at its sole cost and expense to maintain in good order, replace and perform repairs to all parking areas, the trunk lines of the electrical and plumbing system, exterior, roof, roof system and components, foundation, slab floor, and structural elements of the Leased Premises. Lessee shall be responsible for maintaining all electrical and plumbing lines within the Building beyond the main trunk lines, as well as any lighting, heating and air-conditioning equipment. Maintenance of all electrical or plumbing fixtures in the Building, whether installed by Lessor or Lessee, shall become the sole responsibility of the Lessee for the term of this Lease. If Lessor fails to make such repairs or replacements promptly or within 15 days of occurrence, Lessee may, at its option, make such repairs or replacements and Lessor shall repay the costs therof to Lessee on demand.

-5-

**CONFIDENTIAL**    **SUNBELT 000702**

## 10.
## Indemnification

Except for Lessor, or its employees, agents, representatives or contractors' negligence or willful misconduct, or Lessor's failure to perform its obligations hereunder, Lessee shall indemnify and hold harmless Lessor from and against any and all claims, liabilities, expenses, losses and damages arising from Lessee's use of the Leased Premises, or from the conduct of Lessee's business, or from any activity, work or things done by Lessee in or about the Leased Premises and shall further indemnify and hold harmless Lessor from and against any and all claims arising from any breach or default in the performance of any obligation on Lessee's part to be performed under the terms of this Lease, or arising from any negligence of the Lessee, or any of Lessee's agents, contractors, or employees and from and against all costs, reasonable attorney's fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon, and in case any action or proceeding be brought against Lessor by reason of any such claim, Lessee upon notice from Lessor, shall defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor.

Except for Lessee, or its employees, agents, representatives or contractors' negligence or willful misconduct, or Lessee's failure to perform its obligations hereunder, Lessor shall indemnify and hold harmless Lessee from and against any and all claims, liabilities, expenses, losses and damages arising from any breach or default in the performance of any obligation on Lessor's part to be performed under the terms of this Lease, or arising from any negligence of the Lessor, or any of Lessor's agents, contractors, or employees and from and against all costs, reasonable attorney's fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon, and in case any action or proceeding be brought against Lessee by reason of any such claim, Lessor upon notice from Lessee, shall defend the same at Lessor's expense by counsel reasonably satisfactory to Lessee.

Pursuant to this Section 16, the Lessor and Lessee hereby provide that all parties hereto shall be subject to and have the benefit of the provisions of La. R.S. 9:3221.

In addition, Lessee waives those rights of Warranty against Vices or Defects expressed in Civil Code Articles 2696 and 2697, it being further expressly acknowledged by Lessee that Lessor has not had possession of the Leased Premises and that Lessee has owned or occupied the Leased Premises for 3 months preceding this Lease.

## 11.
## Alterations or Additions by Lessee

Except as herein otherwise provided for, all alterations, replacements, additions

- 6 -

**CONFIDENTIAL**                    **SUNBELT 000703**

and improvements made upon the Leased Premises by Lessee, including all component parts thereof ("Lessee's Improvements"), shall be done at Lessee's sole expense, but only with the prior express written consent of Lessor, which consent shall not be unreasonably withheld, exercised, conditioned or delayed.

Lessee shall furnish plans and specifications incorporating Lessee's Improvements ("Plans and Specifications") for Lessor's prior approval. Notwithstanding the foregoing, failure of Lessor to approve plans for any improvements, alterations or additions within seven (7) business days of receipt shall conclusively be deemed approval of said plans.   The approval by Lessor of the Plans and Specifications shall not constitute the assumption of any liability on the part of Lessor for their compliance or conformity with applicable building codes and the requirements of this Lease or for their accuracy, and Lessee shall be solely responsible for such Plans and Specifications.  In addition, the approval by Lessor of the Plans and Specifications shall not constitute a waiver by Lessor of the right to thereafter require Lessee to amend the same to provide for any corrections or omissions by Lessee of items required by building codes or this Lease which are later discovered by Lessor.

All heating, ventilating, and air conditioning equipment, plumbing fixtures, electrical panels and installations, carpeting, floor coverings, ceiling fans, window treatments, light fixtures, hot water heaters, and other such equipment relating to the mechanical systems of the improvements constructed by Lessee on the Leased Premises or otherwise attached thereto or forming its component parts within the meaning of La. Civ. Code art. 466 (collectively, the "Component Parts"), whether placed on the improvements at the beginning of the term or thereafter, shall constitute part of the improvements and shall become Lessor's property at the end of the Term of this Lease without any obligation on the part of Lessor to reimburse Lessee or any other person or entity therefor.  Lessor acknowledges and agrees that all trade fixtures, machinery, equipment, bottle manufacturing equipment, furniture, signs or other personal property other than Component Parts (hereinafter such personal property not constituting Component Parts is referred to collectively as the "Equipment") of whatever kind and nature installed or affixed and thereafter kept or installed on the Leased Premises by Lessee or sublessee, shall not become the property of Lessor or a part of the realty no matter how affixed to the Leased Premises, and may be removed by Lessee or sublessee, in its discretion, at any time and from time to time during the entire term of this Lease and any extension thereof, provided that Lessee or sublessee shall repair any damages caused by such removal and, if removed at the end of the Term of this Lease that the Leased Premises are returned to the same condition as when let, ordinary wear and tear, acts of God, terrorism, casualty, civil disorder and other conditions beyond Lessee's reasonable control excepted.

Upon request of Lessee, Lessor shall execute and deliver, in a form reasonably

- 7 -

CONFIDENTIAL          SUNBELT 000704

acceptable to Lessor, Lessor's Waiver forms submitted by any vendor, lessor, chattel mortgagee, lender secured by a security interest in, owner or holder of the Equipment or other personal property of Lessee or sublessee kept or installed on the Leased Premises by Lessee or sublessee, setting forth that Lessor subordinates in favor of such vendor, lessor, chattel mortgagee, lenders, owner or holder, any lien claim, interest or other right therein superior to that of such vendor, lessor, chattel mortgagee, lenders, owner or holder. Lessor shall further acknowledge that Equipment or other personal property covered by such Lessor's Waiver forms is personal property and is not to become part of the realty no matter how affixed thereto and that such property may be removed from the Leased Premises by the vendor, lessor, chattel mortgagee, lenders, owner or holder at any time upon default by the Lessee or sublessee in the terms of such chattel mortgage, security agreement or other similar documents, free and clear of any claim or lien of Lessor, provided that Lessee or sublessee shall repair any damages caused by such removal.

## 12.
### Public Authorities

Lessor warrants, that on the commencement day of the Lease, the Leased Premises will comply with all applicable laws, ordinances, rules and regulations of governmental authorities ("Applicable Law"). After commencement of the Lease, Lessee shall comply with all Applicable Laws, ordinances, rules and regulations of governmental authorities relating to the Leased Premises and the use and occupancy thereof.

## 13.
### Signs by Lessee

Subject to Lessor's prior written approval, which approval shall not be unreasonably withheld, exercised, conditioned or delayed, Lessee shall have the right to erect and maintain signs advertising Lessee's business on the interior and exterior of the Leased Premises, provided that such signs shall be erected and maintained in accordance with the rules and regulations of the properly constituted authorities. Lessee shall remove all such signs at the expiration of this Lease and shall repair any damage to the Leased Premises caused by the erection, maintenance or removal thereof.

## 14.
### Entry by Lessor

Lessor shall have the right upon reasonable notice, except in case of emergency, to enter the Leased Premises at all reasonable times for the purpose of inspecting the same, to make repairs and alterations, provided Lessor will not unduly inconvenience Lessee's business.

- 8 -

CONFIDENTIAL          SUNBELT 000705

## 15.
### Quiet Possession

Lessee shall be entitled to continuous, uninterrupted, quiet and peaceful possession of the Leased Premises so long as Lease is not in default.

## 16.
### For Sale and For Rent Signs Inspection by Prospects

Lessor shall have the right to place the usual "For Sale" sign on the Leased Premises at any time during the term of this Lease and the usual "For Rent" sign on the Leased Premises during the last three (3) months of the term of this Lease, or any option period, assuming Lessee does not exercise its option to renew. Such signs shall not unreasonably detract from the image of the Building or cover any doors or windows to the Leased Premises. Lessee agrees to allow persons authorized by Lessor to inspect the Leased Premises during (i) the term of this Lease or any option period with the view of purchasing the same and (ii) during the last three (3) months of the term of this Lease with the view of renting the same, such inspections to be at reasonable hours and upon 24 hour notice (which may be verbal).

## 17.
### Surrender of Possession

Upon expiration or termination of this Lease, Lessee shall surrender possession of the Leased Premises immediately to Lessor in good order and condition clear of all personal property and broom cleaned and shall repair all damages to the premises, usual wear and tear, acts of God, terrorism, casualty, civil disorder and other conditions beyond Lessee's reasonable control excepted. Any holding over by Lessee shall not operate, except by written agreement, to extend or renew this Lease, but in such case, Lessor may terminate Lessee's occupancy at once or may consider such occupancy to be from month to month.

## 18.
### Subleasing or Assignment

Lessee shall not assign, sublease or otherwise transfer the Lease, or any right or interest in the Lease or in the Leased Premises, without the prior written consent of Lessor, which consent shall not be unreasonably withheld, conditioned or delayed. Financial strength of the proposed sublessee or assignee shall be a consideration and Lessor may reject such proposed sublessee or assignee on these grounds. Notwithstanding the foregoing or anything in this Lease to the contrary, Lessor hereby

- 9 -

**CONFIDENTIAL**          **SUNBELT  000706**

agrees that Lessee may, without the prior notice to or consent of Lessor, assign this Lease to: (i) an entity controlled by, controlling or under common control of Lessee's parent corporation; or (ii) an entity acquiring or succeeding to substantially all of the business, or substantially all of a business unit, of Lessee, by merger, spin-off, reorganization, consolidation, acquisition (of assets or equity) or otherwise. Notwithstanding anything in this Lease to the contrary, Lessor hereby agrees that Lessee may sublease any portion of the Leased Premises to an approved sublessee for the purpose of installing, maintaining and operating bottle manufacturing equipment used to package the chemicals produced in the Leased Premises. In the event of the assignment, sublease or transfer by Lessee of its interest in this Lease to a person or entity expressly assuming Lessee's obligations under this Lease, Lessee shall thereby be released from any liability for the payment of Rent and for the performance of all other terms, covenants, provisions and obligations of Lessee under the Lease accruing on and after the date of the assignment, sublease or transfer ("Transfer Date"); provided, however, that Lessee shall remain liable for any liabilities or obligations accruing under the Lease prior to the Transfer Date, but only to the extent the same have not been complied with or satisfied in full prior to the Transfer Date.

## 19.
### Auction or Other Sales

No auction sales or other sales not in the ordinary course of Lessee's business shall be conducted on the Leased Premises, without the prior written consent of Lessor.

## 20.
### Damage by Fire or Other Casualty

Lessee shall give Lessor immediate notice of any damage to the Leased Premises caused by fire or other casualty. Lessor shall notify Lessee within thirty (30) days after such casualty of Lessor's intent to repair and the estimate length for such repairs and renovations. If the Leased Premises or the Building is damaged by fire the elements, unavoidable accident or other cause or casualty as to be rendered untenable in whole or in part and necessary repairs can not be made within 120 days of the casualty, this Lease shall terminate as of the time of the Leased Premises or the Building were rendered untenable. However, if the damage is such that same can be repaired within a period of one hundred twenty (120) days of the casualty, Lessor agrees to make such repairs promptly at its own expense, and to allow Lessee an abatement in rent for such time as the Leased Premises remains untenable. During the restoration period, Lessor shall use commercially reasonable efforts to provide Lessee with any temporary accommodations or services that Lessee may require to continue operating at the Leased Premises,

**CONFIDENTIAL**          **SUNBELT 000707**

including without limitation, utility services. Notwithstanding the foregoing, if in Lessee's reasonable opinion Lessee is unable to use the Leased Premises to conduct its business during the restoration period, and Lessee does in fact cease operating at the Leased Premises during the restoration period, then rent shall be abated in its entirety until the restoration of the Leased Premises has been completed or Lessee resumes operating at the Leased Premises, whichever occurs first. If the Lease is not terminated pursuant to the termination rights granted hereunder, and Lessor's reconstruction or repair of the Leased Premises is not completed within 120 days of the casualty (subject to unexpected delays due to inclement weather, unexpected delays in the time required to prepare plans for reconstruction, to obtain building permits, and to complete the likely contract bidding process and all other relevant factors, but not to exceed an additional sixty (60) days), then Lessee shall have the right to terminate this Lease by written notice to Lessor delivered within thirty (30) days after the expiration of the 120 day restoration period (or as so extended), whereupon both parties shall be relieved of all further obligations hereunder, except as otherwise expressly set forth herein.

Notwithstanding the foregoing, if a portion of the Parking Area is damaged or destroyed by casualty, and as a result Lessee is unable to access the Leased Premises or otherwise use the Leased Premises as intended herein, the parties agree that: (i) Lessor shall use commercially reasonable efforts to provide Lessee with any temporary accommodations or services that Lessee may require to continue operating at the Leased Premises, including without limitation, temporary truck access and parking, (ii) if Lessee is unable to use the Leased Premises as intended, or if such use is adversely impacted, the rent due hereunder shall be equitably reduced as agreed upon by the parties until such time as the Parking Areas are restored or Lessor provides satisfactory alternate accommodations to Lessee (in Lessee's sole reasonable opinion), and (iii) if the parties are unable to reach agreement on the reduced rent within sixty (60) days after the date of the casualty, or Lessee is unable to reasonably use the Leased Premises for a period of one hundred twenty (120) days after the date of such casualty, then Lessee may elect to terminate this Lease with written notice to Lessor.

If the loss occurs in the last 18 months of the Term or extension thereof, either party may terminate this Lease effective the date of the casualty by giving the other party written notice of such election within 30 days of the casualty. In the event of partial loss or damage, the rent shall be abated by the proportion of the Leased Premises rendered unfit for use or safe tenancy.

### 21.
### Default

If Lessee fails to pay any installment of rent due under this Lease or fails to comply with any other provision of this Lease, within ten (10) days after written notice by Lessor to Lessee demanding same, provided that said written notice need not be given with

- 11 -

**CONFIDENTIAL**          **SUNBELT 000708**

regard to nonpayment of rent after such notice has been given twice during any calendar year, or if Lessee abandons the Leased Premises or abandons the Leased Premises or removes from the Leased Premises any property against which Lessor is entitled to a Lessor's lien or makes an assignment for the benefit of creditors or is adjudged a bankrupt in an involuntary bankruptcy proceeding or files any type of proceeding or applies for any relief under the laws of the United States relating to bankruptcy or State laws relating to insolvency or if a receiver or other custodian is appointed for Lessee for any of Lessee's property by any court, or if Lessee shall fail to perform any other obligation or to comply with any other provision of this Lease, and such default shall continue for a period of thirty (30) days after written notice therefor from Lessor to Lessee, then, in any such event, Lessor shall have the right, at Lessor's option, without putting Lessee in default and without notice of default, (1) to cancel this Lease effective immediately or effective as of the date Lessor may select or, (2) to proceed one or more times for past due installments of rent only, without prejudicing the right to proceed later for additional installments or exercise any other remedy, or (3) to declare the unpaid rent for the entire unexpired term of this Lease immediately due and payable and at once demand and receive payment thereof or, (4) to have recourse to any other remedy or mode of redress to which Lessor may be entitled by law. In the event Lessor exercises the right to cancel this Lease, then (a) Lessor shall have the right, as soon as said cancellation is effective, to re-enter the Leased Premises and re-let the same for such price and on such terms as may be immediately available, and (b) Lessee shall be and remain liable not only for all rent payable to the date such cancellation becomes effective, but also for all damage or loss suffered by Lessor for the remaining term of this Lease resulting from such cancellation. Failure of Lessor to exercise any right granted in this Paragraph shall not be construed as a waiver of the right to subsequently enforce for a new default such right and no indulgence by Lessor shall be construed as a waiver of any right herein granted.

Notwithstanding any other provisions of this Lease, where the curing of an alleged default requires more than payment of money, and the work of curing said default cannot reasonably be accomplished within the time otherwise permitted herein, and where Lessee has commenced upon the work of curing said default and is diligently pursuing same, then Lessee shall be entitled to reasonable time extensions to permit the completion of the work of curing said default, as a condition precedent to any re-entry or termination, and any defect so cured shall not thereafter be grounds for default.

Notwithstanding any of the terms and provisions herein contained to the contrary, Lessor and Lessee shall each have the duty and obligation to mitigate, in every reasonable manner, any and all damage that may be caused or suffered by virtue of defaults under or violation of any of the terms and provisions of this Lease committed by the other, exercising sound business practices.

- 12 -

**CONFIDENTIAL**          **SUNBELT  000709**

## 22.
## Attorney's Fees

In the event it becomes necessary for Lessor or Lessee to employ an attorney to enforce collection of the rents and other amounts agreed to be paid, or to enforce compliance with any of the covenants and agreements herein contained, the defaulting or breaching party shall pay all reasonable attorney's fees, costs and expense occasioned by such default(s) or breach (es).

## 23.
## Sale of Leased Premises, Release of Lessor on Sale

Lessor is freely permitted, subject to the Right of First Refusal in favor of Lessee, to transfer the Leased Premises, this Lease and Lessor's rights under this Lease. Upon a sale or transfer of the Leased Premises, by Lessor or a subsequent purchaser or transferor thereof, the purchaser or transferee by virtue of such sale or transfer shall be bound for the performance of all Lessor's agreements and obligations under this Lease and the vendor or transferor shall thereupon be released from any and all liability thereafter arising under this Lease.

## 24.
## Right of First Refusal

If at any time during the term of this Lease, Lessor desires to sell, convey or otherwise transfer all or any interest in the Property and/or Leased Premises and receives a bona fide offer from a prospective purchaser, Lessor shall notify Lessee in writing ("Lessor's Notice") of the terms and conditions of such offer. The Lessee shall have the right of first refusal to purchase the Property and/or Leased Premises on the same terms and conditions as the bona fide offer from the prospective purchaser, by notifying Lessor of its intent to so acquire the Property and/or Leased Premises within ten (10) business days after the receipt of Lessor's Notice. If at the end of said ten (10) business day period, Lessee fails to notify the Lessor of its election to purchase the Property and/or Leased Premises, Lessor may sell the Property and/or Leased Premises (subject to the rights of the Lessee pursuant to the terms of this Lease), provided such sale is fully completed within 180 days after receipt of the Lessor's Notice. If such sale is not fully completed within said 180 days, Lessor shall again provide Lessor's Notice and Lessee shall have the right to purchase as provided herein.

**CONFIDENTIAL**          **SUNBELT 000710**

## 25.
### Notices

Any notice, demand, request, document or other act of communication required or permitted to be given under this Lease shall be in writing and may be delivered in person or shall be deemed to be delivered when sent by United States Certified or Registered Mail, postage prepaid, return receipt requested, or by reliable overnight carrier such as Federal Express and addressed to the parties hereto at their respective address as designated herein or at such other address as either party may from time to time direct, by written notice in accordance herewith.

| | |
|---|---|
| Lessor: | SHAF-LAND, L.L.C. |
| | 12717 Hooper Road |
| | Baton Rouge, Louisiana 70868 |
| | Attention: Manager |
| | |
| Lessee: | Sunbelt Chemicals Corp. |
| | 71 Hargrove Grade |
| | Palm Coast, Florida 32137 |
| | Attention: President |

## 26.
### American with Disabilities Act (ADA)

Lessee hereby represents that it is a public accommodation as defined in the ADA. Upon commencement of the Lease, the Lessee at its sole cost and expense shall be solely responsible for taking any and all measures which are required to comply with the requirements of Title I and/or Title III of the ADA within Lessee's Leased Premises. Any alterations to the Leased Premises made by Lessee for the purpose of complying with the ADA or which otherwise require compliance with the ADA shall be done in accordance with this Lease; provided, that Lessor's consent to such alterations shall not constitute either Lessor's assumption, in whole or in part, of Lessee's responsibility for compliance with the ADA, or representation or confirmation by Lessor that such alterations comply with the provisions of the ADA.

Lessee shall indemnify the Lessor for all claims, damages, judgments, penalties, fines, administrative proceedings, costs, expenses and liability arising from Lessee's failure to comply with any of the requirements of Title I and/or Title III of the ADA within Lessee's Leased Premises.

- 14 -

**CONFIDENTIAL**          **SUNBELT  000711**

Lessor shall indemnify the Lessee for all claims, damages, judgments, penalties, fines, administrative proceedings, costs, expenses and liability arising from Lessor's failure to comply with Title III of the ADA within the common areas.

## 27.
## Miscellaneous

Failure of Lessor to require strict performance by Lessee of any of the covenants, provisions or conditions of this Lease, on one or more occasions, shall not constitute a waiver by Lessor of the right thereafter to require strict compliance with said covenants, provisions and conditions.

## 28.
## Governing Law

This Lease shall be deemed to be a contract made under the laws of the State of Louisiana and shall be construed in accordance with and governed by the laws of the State of Louisiana and ordinances of the municipality and parish where the Leased Premises is situated and the rules and regulations of their duly constituted authorities.

## 29.
## Recording

Recording of the Lease is prohibited except as allowed in this paragraph. At the request of either party, the parties shall promptly execute and record, at the cost of the requesting party, an extract of the Lease in accordance with La. R.S. 44:104.

## 30.
## Subordination/Non-Disturbance

Lessor agrees to furnish Lessee with a non-disturbance agreement as hereinafter provided with respect to any mortgage which presently or any time in the future encumbers the premises within ten (10) days after the execution of this Lease or any such mortgage, whatever the case may be. Lessee agrees that this Lease shall at all times be subject and subordinate to the lien of any mortgage that now or hereafter encumbers or affects the Leased Premises and to all renewals, modifications, consolidations, replacements and extensions thereof; provided, however, as a condition to this subordination provision, the Lessor shall obtain from any such mortgagee an agreement in writing, in recordable form acceptable to Lessee, providing in substance that, so long as a default has not occurred under the Lease, , such mortgagee will not disturb Lessee's possession, deprive Lessee of any rights or increase Lessee's obligations under the Lease, nor shall this Lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchase at such foreclosure

- 15 -

**CONFIDENTIAL**            **SUNBELT 000712**

sale, or who acquires title to the Building as a result of such enforcement, shall be bound to Lessee for the terms of this Lease, the rights of Lessee hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect; provided, however, that Lessee fully performs all of its obligations hereunder.

Both parties agree that if called upon by the other each will, within ten (10) days of prior written request of either party, execute an estoppel certificate identifying this Lease, and acknowledging the status of the performance of the requesting party's obligations under this Lease as of the date of such estoppel certificate.

## 31.
## Condemnation

If all of the Leased Premises are taken by condemnation or eminent domain proceedings, or if so much of the Leased Premises are so taken that the remainder is inadequate for Lessee's business purposes, this Lease shall terminate.   In such condemnation proceedings, Lessee may claim compensation for moving expenses and for the taking of any removable installations which by the terms of this Lease Lessee would be permitted to remove at the expiration of this Lease, if such award is separately allowed by the condemning authority; but Lessee shall be entitled to no additional award, and Lessee hereby waives all rights to proceeds for, the loss of its leasehold interest, it being agreed that all damages recoverable by reason of the value of the Leased Premises will belong and be payable to the Lessor.

## 32.
## Review of Documents

Notwithstanding any provision to the contrary in this Lease, the parties hereto acknowledge that (1) they have reviewed this Lease in detail prior to execution of same, and (2) they have had the opportunity to review this Lease with their respective counsel.

## 33.
## Conflicting Provisions

If there is any conflict between the printed portions and the typewritten or handwritten portions of this Lease, the typewritten or handwritten portions shall prevail.

**CONFIDENTIAL**          **SUNBELT 000713**

34.
### Effect of Provisions

All of the provisions contained herein, shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, executors, administrators, successors and assigns. If any section, paragraph, sentence or portion of this Lease or the application thereof to any party or circumstance shall, to any extent, be or become invalid or illegal, such provision is and shall be null and void, but, to the extent that said null and void provisions do not materially change the overall agreement and intent of this entire Lease, the remainder of this Lease shall not be affected thereby and each remaining provision of this Lease shall be valid and enforceable to the fullest extent provided by law.

35.
### Entire Agreement

The whole agreement between the parties hereto is set forth in this instrument and they shall not be bound by any oral or written agreements, conditions, understanding or representations other than are expressly stipulated and set forth herein or in any amendments hereto.  Any amendments or other changes to the terms and conditions to this Lease are to be in writing and signed by the parties hereto.

LESSOR:
SHAF-LAND, L.L.C.,
a Louisiana limited liability company

By: _____
Name: _____
Title: _____

LESSEE:
Sunbelt Chemicals Corp.,
a South Carolina Corporation

By: _____
Name: _____
Title: _____

- 17 -

**CONFIDENTIAL**          **SUNBELT  000714**

Exhibit A
Legal Description

One certain tract or parcel of land, together with all buildings and improvements thereon and all rights, ways, privileges and appurtenances thereunto belonging, containing 10.50 acres, lying and forming portions of Sections 57, 58 and 59, T-7-S, R-12-E, and Section 50, T-6-S, R-12-E, Ward 4, West Baton Rouge Parish, Louisiana, and being a portion of the property known as the Poplar Grove Plantation. Said tract of land herein conveyed being designated as TRACT PGP-1A-2 on the plat of survey prepared by Joseph Garrett, R.L.S., dated November 20, 1995, entitled, "MAP SHOWING SURVEY OF TRACT PGP-1A-1 AND TRACT PGP-1A-2 BEING THE RESUBDIVISION OF TRACT PGP-1A, FORMERLY A PORTION OF POPLAR GROVE PLANTATION LYING WEST OF LOUISIANA HIGHWAY ONE (1) LOCATED IN SECTION 50, T-6-S, R-12-E, AND SECTIONS 57, 58 AND 59, T-7-S, R-12-E, SOUTHEASTERN LAND DISTRICT WEST OF THE MISSISSIPPI RIVER, WEST BATON ROUGE PARISH, LOUISIANA FOR DISCOVERY INDUSTRIAL DEVELOPMENT CORPORATION", and further shown on Map Showing Boundary Survey with Improvements of that certain Tract PGP-1A-2 of Poplar Grove Plantation for Sunbelt Chemicals II, LLC prepared by Patin Engineers and Surveyors, Inc. (Cletus Langlois, PLS) dated December 4, 2007 (Job No. 07-207) ("the Property).

SUBJECT TO AND INCLUDING ALL BENEFITS OF : (1) A predial servitude and covenant to run with the land, as a perpetual servitude of access from Safe Energy Drive, in favor of Tract PGP-1A-1, designated as "25' Servitude of Access" on the western boundary of the tract conveyed herein, more particularly shown and described on the Garrett plat of survey hereinabove referred to; (2) A predial servitude and covenant to run with the land, as a perpetual servitude of access being a portion of Safe Energy Drive, in favor of Tract PGP-1A-1 and Tract PGP-1B, and such other properties as per agreements of record and/or as may be granted by vendor, designated as "70' Access Road Servitude" on the northern boundary of the tract conveyed herein, more particularly shown and described on the plat of survey hereinabove referred to; and (3) all servitudes and easements as shown on the above described plat of survey; and (4) This description includes a predial servitude and covenant to run with the land for the non-exclusive use of that certain "50' Railroad Spur Servitude" as is more particularly shown and described on plats of survey hereinabove described and in the public records of West Baton Rouge Parish, Louisiana and further includes a predial servitude and covenant to run with the land for the non-exclusive use of Safe Energy Drive as is more particularly shown and described on the plats of survey hereinabove described and in the public records of West Baton Rouge Parish, Louisiana; and (5) Including, all rights in favor of the Property as granted under Road Right of way and Servitude Agreement filed of record on March 19, 1987, at COB 221, page 161, Official Records of West Baton Rouge Parish, LA, as amended at act filed of record on September 3, 1987, at COB 228, page 24; and (6) Including all rights in favor of the Property as granted under Predial Servitude

- 18 -

**CONFIDENTIAL**                    **SUNBELT 000715**

and Boundary Agreement filed of record on July 27, 1994, at COB 320, page 154, Official Records of West Baton Rouge Parish, LA (herein collectively referred to as the "Property".)

**CONFIDENTIAL**        **SUNBELT  000716**

## EXTRACT OF LEASE

Pursuant to Louisiana R.S. §44:104, the parties hereto, for the purposes of giving record notice of that certain Lease dated April 4, 2008, (the "Lease"), between SHAF-LAND, L.L.C., a Louisiana limited liability company ("Lessor"), and Sunbelt Chemicals Corp., a South Carolina corporation ("Lessee"), hereby set forth the following:

1. **Lessor:**     SHAF-LAND, L.L.C., a Louisiana limited liability company.

2. **Lessee:**     Sunbelt Chemicals Corp., a South Carolina corporation.

3. **Date of Execution of Lease:** Lease dated April 4, 2008;

4. **Description of Leased Property:**

   Three (3) buildings containing a total of approximately 75,700 rentable square feet having a street address of 1259 Safe Energy Drive, Port Allen, Louisiana 70767, together with any parking spaces or areas serving the property

5. **Primary Term of Lease:** The Primary Term of the Lease shall commence on April 4, 2008 and shall run for a period ending April 3, 2015.

6. **Renewal Options:** Lessee shall have the option(s) to extend the term of this Lease for (2) consecutive extended term(s), the first extended term shall be for a period of two (2) years, and the second extended term shall be for a period of three (3) years.

7. **Option to Purchase:** The Lease contains a right of first refusal for the Lessee to purchase the Leased Premises during the lease term, subject to the conditions set forth in the Lease.

8. **Incorporation of Lease:** This Extract is for informational purposes, and nothing contained herein shall be deemed in any way to modify or otherwise affect the terms or conditions of the Lease. All terms and conditions of the Lease are hereby incorporated herein by reference. In the event of any inconsistency between the terms of the Lease and this Extract, the terms of the Lease will control.

**CONFIDENTIAL**          **SUNBELT  000717**

IN WITNESS WHEREOF, Lessor and Lessee have executed this Extract of Lease to be effective as of April 4, 2008.

WITNESSES FOR LESSOR:

(1) _____
    SAMUEL A. BACOT

(2) _____
    CINDy N. Shotwell

SHAF-LAND, L.L.C.,
a Louisiana limited liability company

By: _____
Name: Richard D Shaffett
Title: Manager

WITNESSES FOR LESSEE:

(1) _____

(2) _____

SUNBELT CHEMICALS CORP.,
a South Carolina corporation

By: _____
Name: R. Patrick Weston
Title: Secretary

STATE OF LOUISIANA
PARISH OF WEST BATON ROUGE
I HEREBY CERTIFY that the within and foregoing is
a true and correct copy of the original as recorded on the _____ day of
_____ 20__ in Book _____ Page _____ Records of
Entry Number 131 of the _____ Records of
West Baton Rouge Parish Louisiana, et. _____
IN FAITH WHEREOF, Witness my hand and the impression
of the seal of my said office at Port Allen, Louisiana, on this _____
day of _____ AD, 20__
DEPUTY CLERK OF COURT

CONFIDENTIAL                    SUNBELT  000718



**BIENVENU
BONNECAZE
FOCO** APLLC
**&VIATOR
HOLINGA**

PHILLIP E. FOCO
*Partner*

225.388.5603 (Direct)
225.388.5622 (Fax)
phillip.foco@bblawla.com

Sunbelt Chemicals Corp.
71 Hargrove Grade
Palm Coast, Florida 32137
Attention: President

**Via Certified Mail**
*Article No. 7013 2250 0000 4911 6564*

Re:   SHAF-LAND, L.L.C.
Leased property at 1259 Safe Energy Drive, Port Allen, Louisiana 70767

Dear Sir:

My firm has been retained by SHAF-LAND, L.L.C. in connection with issues relating to the Commercial Lease executed between it and Sunbelt Chemicals Corp. on April 4, 2008, which Commercial Lease is attached hereto as Exhibit "A." After Sunbelt recently advised SHAF-LAND that it would not be renewing the Commercial Lease after its primary term concludes on April 3, 2015, SHAF-LAND began the process of marketing the Leased Premises in an effort to identify a new lessee. During this process, SHAF-LAND was made aware that Sunbelt's operations on the Leased Premises during the lease term have caused serious damage to the Leased Premises, including but not limited to damage to the roof, walls, electrical components and structural support system of at least one of the buildings which Sunbelt occupied and in which it conducted its operations during the lease term. For your reference, photographs depicting the condition of the building in question are attached as Exhibit "B." The damage in question is so severe that SHAF-LAND has been advised that the building in question may require demolition and re-construction in its entirety. Under the circumstances, SHAF-LAND is unable to re-lease the premises until the damages caused by Sunbelt's operations are repaired.

Section 17 of the Commercial Lease obligates Sunbelt to "surrender possession of the Leased Premises immediately to Lessor in good order and condition clear of all personal property and broom cleaned and shall repair all damages to the premises, usual wear and tear, acts of God, terrorism, casualty, civil disorder and other conditions beyond the Lessee's reasonable control excepted."

Additionally, Louisiana Civil Code article 2683 obligates a lessee to "use the thing as a prudent administrator and in accordance with the purpose for which it was leased" and "to return the thing at the end of the lease in a condition that is the same as it was when the things was delivered to him, except for normal wear and tear..." Article 2686 provides that "if the lessee uses the thing... in a manner that may cause damage to the thing" the lessor is entitled to recover "any damages he may have sustained." Article 2687 further provides that the "lessee is liable for damage to the thing caused by his fault or that of a person who, with his consent, is on the premises or uses the thing." Finally, Article 2692 obligates the lessee to "repair damage to the thing caused by his fault or that of persons who, with his consent, are on the premises or use the thing, and to

4210 Bluebonnet Blvd. Baton Rouge, LA 70809   ■   PHONE: 225.388.5600   FAX: 225.388.5622   ■
**CONFIDENTIAL**                        **SUNBELT 000719**

**EXHIBIT
B**

repair any deterioration resulting from his or their use to the extent it exceeds the normal or agreed use of the thing." The Louisiana Supreme Court has interpreted these articles to mean that a lessee has an obligation to restore the property to its pre-lease condition at the termination of the lease, minus wear and tear, and to correct any damage caused by the lessee's unreasonable and excessive operations. *Marin v. Exxon Mobil Corp.*, 48 So.3d 234 (La. 10/19/10).

The damage occasioned to the Leased Premises by Sunbelt's operations far exceeds what anyone could consider normal wear and tear and is clearly the result of Sunbelt's unreasonable and excessive operations on the Leased Premises. On behalf of SHAF-LAND, demand is hereby made on Sunbelt to restore the property in accordance with its obligations under the Commercial Lease and the Louisiana Code of Civil Procedure.

Moreover, considering the nature of Sunbelt's operations and the effects which these operations have had on the Leased Premises, environmental contamination is an obvious concern. Accordingly, SHAF-LAND hereby makes demand on Sunbelt to perform the appropriate environmental assessments, and if necessary, remediation of the Leased Premises in accordance with Sunbelt's obligations under the Commercial Lease and the Louisiana Civil Code.

We would also ask that Sunbelt provide a copy of any and all policies of insurance that it was required to maintain pursuant to Section 8 of the Commercial Lease, including but not limited to those policies of insurance on which SHAF-LAND was required to be named as an additional insured, and that Sunbelt place those insurers on notice of the loss occasioned by its operations on the Leased Premises.

Finally, it is SHAF-LAND's position that it is in everyone's best interest to amicably and efficiently resolve these issues so that the Leased Premises can be placed back into the stream of commerce. To that end, please be advised that until the Leased Premises are restored and the appropriate remediation and repairs are conducted, Sunbelt cannot fulfill its obligation to surrender possession of the Leased Premises in accordance with Section 17 of the Commercial Lease or the Louisiana Code of Civil Procedure. Accordingly, if these obligations are not satisfied by the end of the primary term of the Commercial Lease, Sunbelt will be deemed to be in continuing possession of the Leased Premises and will be required to pay rentals on a month to month basis until those obligations are performed and/or to pay all damages that become due under the terms of the Commercial Lease and/or the Louisiana Code of Civil Procedure.

Very truly yours,

BIENVENU, BONNECAZE, FOCO, VIATOR & HOLINGA, APLLC

Philip E. Foco

PEF/vp

Enclosure

cc:     Tim Capp (via U.S. Mail)

**CONFIDENTIAL**          **SUNBELT 000720**

# EXHIBIT B

CONFIDENTIAL          SUNBELT  000721



CONFIDENTIAL          SUNBELT 000722



CONFIDENTIAL

SUNBELT 000723



CONFIDENTIAL          SUNBELT 000724



CONFIDENTIAL

SUNBELT 000725



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

SUNBELT 000728



SUNBELT 000729

CONFIDENTIAL



CONFIDENTIAL          SUNBELT 000730



CONFIDENTIAL

SUNBELT 000731



CONFIDENTIAL          SUNBELT 000732



CONFIDENTIAL          SUNBELT 000733



CONFIDENTIAL                SUNBELT 000734



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL          SUNBELT 000737



CONFIDENTIAL                    SUNBELT 000738



CONFIDENTIAL



CONFIDENTIAL          SUNBELT  000740



CONFIDENTIAL   SUNBELT 000741



CONFIDENTIAL

SUNBELT 000742



CONFIDENTIAL          SUNBELT 000743



CONFIDENTIAL

SUNBELT 000744



CONFIDENTIAL                    SUNBELT 000745



CONFIDENTIAL                    SUNBELT 000746



CONFIDENTIAL          SUNBELT 000747



CONFIDENTIAL

SUNBELT 000748



CONFIDENTIAL

SUNBELT 000749



CONFIDENTIAL



CONFIDENTIAL SUNBELT 000751



CONFIDENTIAL          SUNBELT 000732



CONFIDENTIAL

SUNBELT 000753



CONFIDENTIAL          SUNBELT 000754



CONFIDENTIAL                    SUNBELT 000755



CONFIDENTIAL          SUNBELT 000750



CONFIDENTIAL SUNBELT 000757



CONFIDENTIAL          SUNBELT 000758



CONFIDENTIAL          SUNBELT 000759



CONFIDENTIAL SUNBELT 000760



CONFIDENTIAL          SUNBELT 000701



CONFIDENTIAL



CONFIDENTIAL          SUNBELT 000703



CONFIDENTIAL           SUNBELT 000704



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL          SUNBELT 000767



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

SUNBELT  000770



# BIENVENU BONNECAZE FOCO [APLLC] VIATOR & HOLINGA

PHILLIP E. FOCO
Partner

225.388.5603 (Direct)
225.388.5622 (Fax)
phillip.foco@bblawla.com

May 5, 2015

Sunbelt Chemicals Corp.                    **Via Certified Mail**
71 Hargrove Grade                          *Article No. 7014 2120 0002 6446 6085*
Palm Coast, Florida 32137
Attention: President

Re:    SHAF-LAND, L.L.C.
       Leased Property at 1259 Safe Energy Drive, Port Allen, Louisiana 70767

Dear Sir:

As you know, I represent SHAF-LAND, L.L.C. regarding the Commercial Lease executed between it and Sunbelt Chemicals Corp. on April 4, 2008. I am in receipt of a green card showing delivery of my February 13, 2015 correspondence to Sunbelt Chemicals Corp. on March 20, 2015. A copy of the green card is attached hereto as Exhibit "A." To date, I have not received a response from Sunbelt Chemicals Corp. to my February 13, 2015 correspondence. Out of an abundance of caution, I have re-attached the February 13, 2015 correspondence and its exhibits, *in globo*, as Exhibit "B" hereto.

SHAF-LAND, L.L.C. is currently negotiating the sale of the Leased Property to a third party. SHAF-LAND, L.L.C. anticipates being forced to sell the Leased Property for less than market value due to Sunbelt Chemicals Corp.'s failure to remediate and/or repair the Leased Property, as set forth more fully in my February 13, 2015 correspondence. (*See* Exhibit "B".) Assuming the sale of the Leased Property is finalized, SHAF-LAND, L.L.C. intends to file suit against Sunbelt Chemicals Corp. for diminution of value of the Leased Property and the related reduction in sale price.

This letter serves as SHAF-LAND, L.L.C.'s final pre-suit demand for Sunbelt Chemicals Corp. to remediate and/or repair the Leased Property. Further, this letter puts Sunbelt Chemicals Corp. on unequivocal notice of SHAF-LAND, L.L.C.'s intention to sell the Leased Property. SHAF-LAND, L.L.C. will not have the authority to grant Sunbelt Chemicals Corp. access to the Leased Property after the effective date of the sale. To the extent you wish to inspect and/or perform any testing or sampling of the Leased Property, contact me immediately so that we may set up a time for you to do so prior to the sale. After the sale is finalized, SHAF-LAND, L.L.C. anticipates that the purchaser will demolish and/or perform repairs to the building located on the Leased Property, and that any environmental contamination that may have been caused by

Sunbelt's operations will be remediated.  Although it is SHAF-LAND'S position that Sunbelt is fully aware of the extensive damages caused by its operations, considering it had exclusive possession of the Leased Property for over seven years, this letter is intended to put Sunbelt on notice that if it desires to perform an assessment of the damages it has caused in connection with the impending litigation it should do so immediately.

Finally, we would also remind you that Sunbelt still has not made its rental payment for the month of March 2015.  We would ask that you please remit same immediately.

I look forward to your immediate reply.

Very truly yours,

BIENVENU, BONNECAZE, FOCO, VIATOR & HOLINGA, APLLC

Phillip E. Foco

PEF/vp

Enclosures

cc:     Tim Capp (via U.S. Mail)

**CONFIDENTIAL**          **SUNBELT  000772**

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Elke Schudelm_   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

_Elke Schudelheim_   _3-20_

D. Is delivery address different from Item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

1. Article Addressed to:

Sunbelt Chemicals Corp.
Attn: President
71 Hangrove Trade
Palm Coast, FL 32137-5114

3. Service Type
☐ Certified Mail   ☐ Priority Mail Express™
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7013 2250 0000 4911 6564

PS Form 3811, July 2013   Domestic Return Receipt

CONFIDENTIAL

SUNBELT 000773

EXHIBIT
14

**BIENVENU
BONNECAZE
FOCO** A·P·L·C
**VIATOR
&HOLINGA**

*PHILLIP E. FOCO*
*Partner*

*225.388.5603 (Direct)*
*225.388.5622 (Fax)*
*phillip.foco@bblawla.com*

Sunbelt Chemicals Corp.
71 Hargrove Grade
Palm Coast, Florida 32137
Attention: President

**Via Certified Mail**
*Article No. 7013 2250 0000 4911 6564*

Re:      SHAF-LAND, L.L.C.
          Leased property at 1259 Safe Energy Drive, Port Allen, Louisiana 70767

Dear Sir:

My firm has been retained by SHAF-LAND, L.L.C. in connection with issues relating to the Commercial Lease executed between it and Sunbelt Chemicals Corp. on April 4, 2008, which Commercial Lease is attached hereto as Exhibit "A." After Sunbelt recently advised SHAF-LAND that it would not be renewing the Commercial Lease after its primary term concludes on April 3, 2015, SHAF-LAND began the process of marketing the Leased Premises in an effort to identify a new lessee.  During this process, SHAF-LAND was made aware that Sunbelt's operations on the Leased Premises during the lease term have caused serious damage to the Leased Premises, including but not limited to damage to the roof, walls, electrical components and structural support system of at least one of the buildings which Sunbelt occupied and in which it conducted its operations during the lease term.  For your reference, photographs depicting the condition of the building in question are attached as Exhibit "B."  The damage in question is so severe that SHAF-LAND has been advised that the building in question may require demolition and re-construction in its entirety.  Under the circumstances, SHAF-LAND is unable to re-lease the premises until the damages caused by Sunbelt's operations are repaired.

Section 17 of the Commercial Lease obligates Sunbelt to "surrender possession of the Leased Premises immediately to Lessor in good order and condition clear of all personal property and broom cleaned and shall repair all damages to the premises, usual wear and tear, acts of God, terrorism, casualty, civil disorder and other conditions beyond the Lessee's reasonable control excepted."

Additionally, Louisiana Civil Code article 2683 obligates a lessee to "use the thing as a prudent administrator and in accordance with the purpose for which it was leased" and "to return the thing at the end of the lease in a condition that is the same as it was when the things was delivered to him, except for normal wear and tear…"  Article 2686 provides that "if the lessee uses the thing… in a manner that may cause damage to the thing" the lessor is entitled to recover "any damages he may have sustained."  Article 2687 further provides that the "lessee is liable for damage to the thing caused by his fault or that of a person who, with his consent, is on the premises or uses the thing."  Finally, Article 2692 obligates the lessee to "repair damage to the thing caused by his fault or that of persons who, with his consent, are on the premises or use the thing, and to

4210 Bluebonnet Blvd. Baton Rouge, LA 70809   ✉   PHONE: 225.388.5600   FAX: 225.388.5622   ✉   bblawla.com

**CONFIDENTIAL**            **SUNBELT 000774**



repair any deterioration resulting from his or their use to the extent it exceeds the normal or agreed use of the thing." The Louisiana Supreme Court has interpreted these articles to mean that a lessee has an obligation to restore the property to its pre-lease condition at the termination of the lease, minus wear and tear, and to correct any damage caused by the lessee's unreasonable and excessive operations. *Marin v. Exxon Mobil Corp.*, 48 So.3d 234 (La. 10/19/10).

The damage occasioned to the Leased Premises by Sunbelt's operations far exceeds what anyone could consider normal wear and tear and is clearly the result of Sunbelt's unreasonable and excessive operations on the Leased Premises. On behalf of SHAF-LAND, demand is hereby made on Sunbelt to restore the property in accordance with its obligations under the Commercial Lease and the Louisiana Code of Civil Procedure.

Moreover, considering the nature of Sunbelt's operations and the effects which these operations have had on the Leased Premises, environmental contamination is an obvious concern. Accordingly, SHAF-LAND hereby makes demand on Sunbelt to perform the appropriate environmental assessments, and if necessary, remediation of the Leased Premises in accordance with Sunbelt's obligations under the Commercial Lease and the Louisiana Civil Code.

We would also ask that Sunbelt provide a copy of any and all policies of insurance that it was required to maintain pursuant to Section 8 of the Commercial Lease, including but not limited to those policies of insurance on which SHAF-LAND was required to be named as an additional insured, and that Sunbelt place those insurers on notice of the loss occasioned by its operations on the Leased Premises.

Finally, it is SHAF-LAND's position that it is in everyone's best interest to amicably and efficiently resolve these issues so that the Leased Premises can be placed back into the stream of commerce. To that end, please be advised that until the Leased Premises are restored and the appropriate remediation and repairs are conducted, Sunbelt cannot fulfill its obligation to surrender possession of the Leased Premises in accordance with Section 17 of the Commercial Lease or the Louisiana Code of Civil Procedure. Accordingly, if these obligations are not satisfied by the end of the primary term of the Commercial Lease, Sunbelt will be deemed to be in continuing possession of the Leased Premises and will be required to pay rentals on a month to month basis until those obligations are performed and/or to pay all damages that become due under the terms of the Commercial Lease and/or the Louisiana Code of Civil Procedure.

Very truly yours,

BIENVENU, BONNECAZE, FOCO, VIATOR & HOLINGA, APLLC

Phillip E. Foco

PEF/vp

Enclosure

cc:     Tim Capp (via U.S. Mail)

**CONFIDENTIAL**          **SUNBELT  000775**

*oris*

## COMMERCIAL LEASE

THIS COMMERCIAL LEASE is entered into effective as of the 4th day of April, 2008 ("Effective Date"), by and between **SHAF-LAND, L.L.C.**, a Louisiana limited liability company ("Lessor") and **Sunbelt Chemicals Corp.**, a South Carolina corporation ("Lessee") who agree as follows:

### 1.
### Parties and Leased Premises

This Commercial Lease (the "Lease") is made by and between SHAF-LAND, L.L.C., a Louisiana limited liability company ("Lessor") and Sunbelt Chemicals Corp., a South Carolina corporation ("Lessee"). Lessor owns, operates or controls certain real property situated in the City of Port Allen, West Baton Rouge Parish, State of Louisiana, which real property (the "Property") is more particularly described on Exhibit A attached hereto. Lessor hereby leases to Lessee three (3) buildings (collectively the "Building") located at the Property containing a total of approximately 75,700 rentable square feet and having a street address of 1259 Safe Energy Drive, Port Allen, Louisiana 70767, together with any parking spaces or areas serving the Property (the "Parking Area(s)"), any driveways, the land upon which they are located and all other buildings and improvements thereon are herein collectively referred to as the "Leased Premises".

### 2.
### In Solido Liability

If the above described property is leased to more than one party, the obligations of all such parties hereunder, as Lessee, shall be in solido.

### 3.
### Term

The "Commencement Date" of this Lease is April 4, 2008. Unless extended or earlier terminated in accordance with the provisions herein, the primary term of this Lease is for a period of seven (7) years and shall begin on the Commencement Date and end on April 3, 2015.

Lessee shall have the option(s) to extend the term of this Lease for (2) consecutive extended term(s), the first extended term shall be for a period of two (2) years, and the second extended term shall be for a period of three (3) years, provided that the Lease is in full force and effect and no material defaults exist under the Lease at the time of such extension. Lessee shall give written notice of its exercise of the respective option at least

- 1 -

**CONFIDENTIAL**     SUNBELT 000776



ninety (90) days prior to the expiration of the original term or the expiration of the then existing term. Each extension term shall be upon the same terms and conditions and the monthly base rent during each extension term shall be in the amounts set forth in Section 4 below.

## 4.
### Rental and Place of Payment

Beginning on the Commencement Date, Lessee shall pay to Lessor, without demand or request on or before the first day of each month of the Term, monthly base rent ("Rent") in the amounts set forth below. All payments of rent shall be made to Lessor, at the address designated in that Section titled "Notices" but Lessor may, from time to time, designate other persons and places for payment of rent by notice to Lessee. Any rent payment not received by the 10th of the month shall be considered delinquent, and Lessee agrees to pay to Lessor as a "late charge", an amount as additional rent, equal to five percent (5%) of the amount past due . The parties agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such payment. Rent for any partial month of the term of this Lease shall be prorated on a per diem basis.

| Effective Dates | Monthly Base Rent | Annual Base Rent |
| --- | --- | --- |
| Year 1 | $20,979 per month | $251,748 annually |
| Year 2 | $20,979 per month | $251,748 annually |
| Year 3 | $20,979 per month | $251,748 annually |
| Year 4 | $22,079 per month | $264,948 annually |
| Year 5 | $22,079 per month | $264,948 annually |
| Year 6 | $22,079 per month | $264,948 annually |
| Year 7 | $23,151 per month | $277,812 annually |
| Year 8 | $23,151 per month | $277,812 annually |
| Year 9 | $23,151 per month | $277,812 annually |
| Year 10 | $24,224 per month | $290,688 annually |
| Year 12 | $24,224 per month | $290,688 annually |
| Year 13 | $24,224 per month | $290,688 annually |

- 2 -

CONFIDENTIAL                    SUNBELT 000777

## 5.
## Utility Charges

Lessee shall promptly pay all charges for gas, electricity, water, telephone and other utilities, including water sprinkler service charges (if applicable) consumed by Lessee on the Leased Premises, including those used for air-conditioning and heating purposes. All accounts for such utilities shall be carried in the Lessee's name only. The Leased Premises, with electrical power, shall be available to Lessee seven (7) days per week/twenty-four (24) hours per day without additional charge beyond the rent.

## 6.
## Use of Premises

Lessee shall use the Leased Premises for manufacturing, packaging, marketing and selling of packaged chemicals and other uses incidental thereto, solely for the purpose of carrying out its own business therein, subject to and in accordance with all applicable zoning and other governmental regulations. Lessor hereby further specifically consents to the installation, maintenance and/or operation of the bottle manufacturing equipment and an associated facility by Lessee or its agent in the Leased Premises as an additional permitted use under the Lease. The Lessee and its agents, invitees, guests and employees shall have the exclusive right to the Parking Areas and park vehicles at such Parking Areas overnight. The Leased Premises shall not be used for any unlawful purpose or in any manner that may damage or depreciate the same or the Building. Lessee shall have the right, but shall not be obligated to contest, by appropriate proceedings in the name of the Lessee or Lessor, the validity or application of any law, ordinance, order, rule, regulation or requirement of any nature affecting the Leased Premises and operation of Lessee's business therein.

## 7.
## Tax Responsibility

Before delinquency, Lessee shall pay taxes assessed during the term of the Lease against inventory, furniture, trade fixtures, apparatus, equipment, or personal property placed by Lessee in the Leased Premises, leasehold improvements installed by Lessee or by Lessor on behalf of Lessee, and any other property of Lessee. Lessor will be responsible for and pay before delinquency any and all payment of all real estate taxes levied against the Leased Premises, Property or Building. Lessee shall reimburse Lessor for the cost of such taxes within thirty (30) days after receiving Lessor's detailed written statement setting forth the amount of such taxes and copies of all invoices and receipts. Lessee's failure to pay within the thirty day period shall entitle Lessor to the same remedies it has upon Lessee's failure to pay rent. Taxes shall be pro rated on a per diem basis for any

- 3 -

**CONFIDENTIAL**          **SUNBELT  000778**

portion of the term of this Lease that occurs during a partial tax year. Nothing contained herein shall prevent Lessor, at its sole cost and expense, from challenging any real estate taxes pursuant to any applicable laws and Lessor hereby agrees that Lessee may, at its sole cost and expense, elect to make such a challenge on Lessor's behalf, and Lessor will reasonably cooperate with any such challenge by Lessee.

## 8.

### Insurance

At all times during the term of this Lease and as part of the consideration for this Lease, Lessee shall provide and maintain, at Lessee's expense, in favor of Lessee as the insured, fire and extended coverage insurance covering Lessee's moveable property, any improvements, alterations or additions made by Lessee to the Leased Premises, any property leased to Lessee within the Leased Premises, and any claims which may arise in connection with the Lessee's operation and use of the Leased Premises. Lessee shall maintain during the Term Comprehensive General Liability insurance with combined single minimum limits of $1,000,000.00 per occurrence and an aggregate of $2,000,000.00 for bodily injury, personal injury and property damage liability.

The policy providing such insurance shall name Lessor and any mortgagee of the Leased Premises as additional insured and a certificate or verification of insurance, evidencing such insurance, shall be delivered to the Lessor within ten (10) days after the execution of this Lease. Thereafter, all renewals thereof are to be delivered to Lessor at least five (5) business days in advance of the expiration date of the existing policy or policies.

The foregoing insurance shall be carried with a responsible insurance company authorized to transact business in the State of Louisiana. Lessee shall deliver to Lessor written verification evidencing such insurance in form reasonably acceptable to Lessor, provided that if the Leased Premises are mortgaged during the period of this Lease, such verification shall be delivered to the mortgagee, if requested by the mortgagee.

In the event Lessee should, for any reason whatsoever, fail to keep the Leased Premises so insured or fail to deliver to Lessor, as aforesaid, the certificate or verification of insurance and the renewals thereof, then Lessor, if it so elects, may itself have such insurance effected in such amounts and in such companies as Lessor may deem proper and may pay the premiums therefor and Lessee covenants and agrees that, within five (5) days after payment and demand therefor by Lessor, Lessee shall immediately repay the amount so paid by Lessor as premiums, together with legal interest thereon, from date of such payment until said amount is repaid.

**CONFIDENTIAL**          **SUNBELT 000779**

Notwithstanding the Lessee's insurance obligations hereinabove, Lessee agrees to defend and save Lessor harmless from any liability, cost or expense, including cost of defense that would otherwise be covered by the insurance required to be maintained herein.

At all times during the term of this Lease, Lessee, at Lessee's sole cost and expense, shall provide and maintain in favor of Lessor as the insured, insurance on the Building, machinery, boilers and equipment therein owned by the Lessor (excluding any property the Lessee is required to insure), in the amount equal to one hundred percent (100%) of the full replacement value thereof (exclusive of costs of excavation, foundations and footing below ground level) against loss by fire and extended coverage. Such insurance shall be issued by a Company and in form approved by Lessor and shall name Lessor and any mortgagee as additional insureds. The Lessor will carry public liability and property damage insurance with respect to the operation of the Leased Premises in reasonable amounts as would be carried by a prudent owner. The Lessor may obtain other insurance as the Lessor or its mortgagee (if any) may determine advisable.

## 9.
## Repairs

Lessee shall be responsible only to maintain the non-structural portions of the interior of the Leased Premises in good repair and condition, ordinary wear and tear excepted. At the termination of this Lease, Lessee shall return the Leased Premises to Lessor, in like order and condition as received, broom clean and free from trash, ordinary decay, wear and tear, acts of God, terrorism, casualty, civil disorder and other conditions beyond Lessee's reasonable control excepted, and shall deliver the keys to the Leased Premises to Lessor.

Lessor shall be responsible at its sole cost and expense to maintain in good order, replace and perform repairs to all parking areas, the trunk lines of the electrical and plumbing system, exterior, roof, roof system and components, foundation, slab floor, and structural elements of the Leased Premises. Lessee shall be responsible for maintaining all electrical and plumbing lines within the Building beyond the main trunk lines, as well as any lighting, heating and air-conditioning equipment. Maintenance of all electrical or plumbing fixtures in the Building, whether installed by Lessor or Lessee, shall become the sole responsibility of the Lessee for the term of this Lease. If Lessor fails to make such repairs or replacements promptly or within 15 days of occurrence, Lessee may, at its option, make such repairs or replacements and Lessor shall repay the costs therof to Lessee on demand.

- 5 -

**CONFIDENTIAL**          **SUNBELT  000780**

## 10.
### Indemnification

Except for Lessor, or its employees, agents, representatives or contractors' negligence or willful misconduct, or Lessor's failure to perform its obligations hereunder, Lessee shall indemnify and hold harmless Lessor from and against any and all claims, liabilities, expenses, losses and damages arising from Lessee's use of the Leased Premises, or from the conduct of Lessee's business, or from any activity, work or things done by Lessee in or about the Leased Premises and shall further indemnify and hold harmless Lessor from and against any and all claims arising from any breach or default in the performance of any obligation on Lessee's part to be performed under the terms of this Lease, or arising from any negligence of the Lessee, or any of Lessee's agents, contractors, or employees and from and against all costs, reasonable attorney's fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon, and in case any action or proceeding be brought against Lessor by reason of any such claim, Lessee upon notice from Lessor, shall defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor.

Except for Lessee, or its employees, agents, representatives or contractors' negligence or willful misconduct, or Lessee's failure to perform its obligations hereunder, Lessor shall indemnify and hold harmless Lessee from and against any and all claims, liabilities, expenses, losses and damages arising from any breach or default in the performance of any obligation on Lessor's part to be performed under the terms of this Lease, or arising from any negligence of the Lessor, or any of Lessor's agents, contractors, or employees and from and against all costs, reasonable attorney's fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon, and in case any action or proceeding be brought against Lessee by reason of any such claim, Lessor upon notice from Lessee, shall defend the same at Lessor's expense by counsel reasonably satisfactory to Lessee.

Pursuant to this Section 16, the Lessor and Lessee hereby provide that all parties hereto shall be subject to and have the benefit of the provisions of La. R.S. 9:3221.

In addition, Lessee waives those rights of Warranty against Vices or Defects expressed in Civil Code Articles 2696 and 2697, it being further expressly acknowledged by Lessee that Lessor has not had possession of the Leased Premises and that Lessee has owned or occupied the Leased Premises for 3 months preceding this Lease.

## 11.
### Alterations or Additions by Lessee

Except as herein otherwise provided for, all alterations, replacements, additions

- 6 -

**CONFIDENTIAL**          **SUNBELT  000781**

and improvements made upon the Leased Premises by Lessee, including all component parts thereof ("Lessee's Improvements"), shall be done at Lessee's sole expense, but only with the prior express written consent of Lessor, which consent shall not be unreasonably withheld, exercised, conditioned or delayed.

Lessee shall furnish plans and specifications incorporating Lessee's Improvements ("Plans and Specifications") for Lessor's prior approval. Notwithstanding the foregoing, failure of Lessor to approve plans for any improvements, alterations or additions within seven (7) business days of receipt shall conclusively be deemed approval of said plans.  The approval by Lessor of the Plans and Specifications shall not constitute the assumption of any liability on the part of Lessor for their compliance or conformity with applicable building codes and the requirements of this Lease or for their accuracy, and Lessee shall be solely responsible for such Plans and Specifications. In addition, the approval by Lessor of the Plans and Specifications shall not constitute a waiver by Lessor of the right to thereafter require Lessee to amend the same to provide for any corrections or omissions by Lessee of items required by building codes or this Lease which are later discovered by Lessor.

All heating, ventilating, and air conditioning equipment, plumbing fixtures, electrical panels and installations, carpeting, floor coverings, ceiling fans, window treatments, light fixtures, hot water heaters, and other such equipment relating to the mechanical systems of the improvements constructed by Lessee on the Leased Premises or otherwise attached thereto or forming its component parts within the meaning of La. Civ. Code art. 466 (collectively, the "Component Parts"), whether placed on the improvements at the beginning of the term or thereafter, shall constitute part of the improvements and shall become Lessor's property at the end of the Term of this Lease without any obligation on the part of Lessor to reimburse Lessee or any other person or entity therefor.  Lessor acknowledges and agrees that all trade fixtures, machinery, equipment, bottle manufacturing equipment, furniture, signs or other personal property other than Component Parts (hereinafter such personal property not constituting Component Parts is referred to collectively as the "Equipment") of whatever kind and nature installed or affixed and thereafter kept or installed on the Leased Premises by Lessee or sublessee, shall not become the property of Lessor or a part of the realty no matter how affixed to the Leased Premises, and may be removed by Lessee or sublessee, in its discretion, at any time and from time to time during the entire term of this Lease and any extension thereof, provided that Lessee or sublessee shall repair any damages caused by such removal and, if removed at the end of the Term of this Lease that the Leased Premises are returned to the same condition as when let, ordinary wear and tear, acts of God, terrorism, casualty, civil disorder and other conditions beyond Lessee's reasonable control excepted.

Upon request of Lessee, Lessor shall execute and deliver, in a form reasonably

- 7 -

**CONFIDENTIAL**        **SUNBELT 000782**

acceptable to Lessor, Lessor's Waiver forms submitted by any vendor, lessor, chattel mortgagee, lender secured by a security interest in, owner or holder of the Equipment or other personal property of Lessee or sublessee kept or installed on the Leased Premises by Lessee or sublessee, setting forth that Lessor subordinates in favor of such vendor, lessor, chattel mortgagee, lenders, owner or holder, any lien claim, interest or other right therein superior to that of such vendor, lessor, chattel mortgagee, lenders, owner or holder. Lessor shall further acknowledge that Equipment or other personal property covered by such Lessor's Waiver forms is personal property and is not to become part of the realty no matter how affixed thereto and that such property may be removed from the Leased Premises by the vendor, lessor, chattel mortgagee, lenders, owner or holder at any time upon default by the Lessee or sublessee in the terms of such chattel mortgage, security agreement or other similar documents, free and clear of any claim or lien of Lessor, provided that Lessee or sublessee shall repair any damages caused by such removal.

## 12.
### Public Authorities

Lessor warrants, that on the commencement day of the Lease, the Leased Premises will comply with all applicable laws, ordinances, rules and regulations of governmental authorities ("Applicable Law"). After commencement of the Lease, Lessee shall comply with all Applicable Laws, ordinances, rules and regulations of governmental authorities relating to the Leased Premises and the use and occupancy thereof.

## 13.
### Signs by Lessee

Subject to Lessor's prior written approval, which approval shall not be unreasonably withheld, exercised, conditioned or delayed, Lessee shall have the right to erect and maintain signs advertising Lessee's business on the interior and exterior of the Leased Premises, provided that such signs shall be erected and maintained in accordance with the rules and regulations of the properly constituted authorities. Lessee shall remove all such signs at the expiration of this Lease and shall repair any damage to the Leased Premises caused by the erection, maintenance or removal thereof.

## 14.
### Entry by Lessor

Lessor shall have the right upon reasonable notice, except in case of emergency, to enter the Leased Premises at all reasonable times for the purpose of inspecting the same, to make repairs and alterations, provided Lessor will not unduly inconvenience Lessee's business.

- 8 -

**CONFIDENTIAL**            **SUNBELT  000783**

## 15.
### Quiet Possession

Lessee shall be entitled to continuous, uninterrupted, quiet and peaceful possession of the Leased Premises so long as Lease is not in default.

## 16.
### For Sale and For Rent Signs Inspection by Prospects

Lessor shall have the right to place the usual "For Sale" sign on the Leased Premises at any time during the term of this Lease and the usual "For Rent" sign on the Leased Premises during the last three (3) months of the term of this Lease, or any option period, assuming Lessee does not exercise its option to renew. Such signs shall not unreasonably detract from the image of the Building or cover any doors or windows to the Leased Premises. Lessee agrees to allow persons authorized by Lessor to inspect the Leased Premises during (i) the term of this Lease or any option period with the view of purchasing the same and (ii) during the last three (3) months of the term of this Lease with the view of renting the same, such inspections to be at reasonable hours and upon 24 hour notice (which may be verbal).

## 17.
### Surrender of Possession

Upon expiration or termination of this Lease, Lessee shall surrender possession of the Leased Premises immediately to Lessor in good order and condition clear of all personal property and broom cleaned and shall repair all damages to the premises, usual wear and tear, acts of God, terrorism, casualty, civil disorder and other conditions beyond Lessee's reasonable control excepted. Any holding over by Lessee shall not operate, except by written agreement, to extend or renew this Lease, but in such case, Lessor may terminate Lessee's occupancy at once or may consider such occupancy to be from month to month.

## 18.
### Subleasing or Assignment

Lessee shall not assign, sublease or otherwise transfer the Lease, or any right or interest in the Lease or in the Leased Premises, without the prior written consent of Lessor, which consent shall not be unreasonably withheld, conditioned or delayed. Financial strength of the proposed sublessee or assignee shall be a consideration and Lessor may reject such proposed sublessee or assignee on these grounds. Notwithstanding the foregoing or anything in this Lease to the contrary, Lessor hereby

- 9 -

**CONFIDENTIAL**          **SUNBELT 000784**

agrees that Lessee may, without the prior notice to or consent of Lessor, assign this Lease to: (i) an entity controlled by, controlling or under common control of Lessee's parent corporation; or (ii) an entity acquiring or succeeding to substantially all of the business, or substantially all of a business unit, of Lessee, by merger, spin-off, reorganization, consolidation, acquisition (of assets or equity) or otherwise. Notwithstanding anything in this Lease to the contrary, Lessor hereby agrees that Lessee may sublease any portion of the Leased Premises to an approved sublessee for the purpose of installing, maintaining and operating bottle manufacturing equipment used to package the chemicals produced in the Leased Premises. In the event of the assignment, sublease or transfer by Lessee of its interest in this Lease to a person or entity expressly assuming Lessee's obligations under this Lease, Lessee shall thereby be released from any liability for the payment of Rent and for the performance of all other terms, covenants, provisions and obligations of Lessee under the Lease accruing on and after the date of the assignment, sublease or transfer ("Transfer Date"); provided, however, that Lessee shall remain liable for any liabilities or obligations accruing under the Lease prior to the Transfer Date, but only to the extent the same have not been complied with or satisfied in full prior to the Transfer Date.

**19.**
**Auction or Other Sales**

No auction sales or other sales not in the ordinary course of Lessee's business shall be conducted on the Leased Premises, without the prior written consent of Lessor.

**20.**
**Damage by Fire or Other Casualty**

Lessee shall give Lessor immediate notice of any damage to the Leased Premises caused by fire or other casualty. Lessor shall notify Lessee within thirty (30) days after such casualty of Lessor's intent to repair and the estimate length for such repairs and renovations. If the Leased Premises or the Building is damaged by fire the elements, unavoidable accident or other cause or casualty as to be rendered untenable in whole or in part and necessary repairs can not be made within 120 days of the casualty, this Lease shall terminate as of the time of the Leased Premises or the Building were rendered untenable. However, if the damage is such that same can be repaired within a period of one hundred twenty (120) days of the casualty, Lessor agrees to make such repairs promptly at its own expense, and to allow Lessee an abatement in rent for such time as the Leased Premises remains untenable. During the restoration period, Lessor shall use commercially reasonable efforts to provide Lessee with any temporary accommodations or services that Lessee may require to continue operating at the Leased Premises,

- 10 -

**CONFIDENTIAL**          **SUNBELT 000785**

including without limitation, utility services. Notwithstanding the foregoing, if in Lessee's reasonable opinion Lessee is unable to use the Leased Premises to conduct its business during the restoration period, and Lessee does in fact cease operating at the Leased Premises during the restoration period, then rent shall be abated in its entirety until the restoration of the Leased Premises has been completed or Lessee resumes operating at the Leased Premises, whichever occurs first. If the Lease is not terminated pursuant to the termination rights granted hereunder, and Lessor's reconstruction or repair of the Leased Premises is not completed within 120 days of the casualty (subject to unexpected delays due to inclement weather, unexpected delays in the time required to prepare plans for reconstruction, to obtain building permits, and to complete the likely contract bidding process and all other relevant factors, but not to exceed an additional sixty (60) days), then Lessee shall have the right to terminate this Lease by written notice to Lessor delivered within thirty (30) days after the expiration of the 120 day restoration period (or as so extended), whereupon both parties shall be relieved of all further obligations hereunder, except as otherwise expressly set forth herein.

Notwithstanding the foregoing, if a portion of the Parking Area is damaged or destroyed by casualty, and as a result Lessee is unable to access the Leased Premises or otherwise use the Leased Premises as intended herein, the parties agree that: (i) Lessor shall use commercially reasonable efforts to provide Lessee with any temporary accommodations or services that Lessee may require to continue operating at the Leased Premises, including without limitation, temporary truck access and parking, (ii) if Lessee is unable to use the Leased Premises as intended, or if such use is adversely impacted, the rent due hereunder shall be equitably reduced as agreed upon by the parties until such time as the Parking Areas are restored or Lessor provides satisfactory alternate accommodations to Lessee (in Lessee's sole reasonable opinion), and (iii) if the parties are unable to reach agreement on the reduced rent within sixty (60) days after the date of the casualty, or Lessee is unable to reasonably use the Leased Premises for a period of one hundred twenty (120) days after the date of such casualty, then Lessee may elect to terminate this Lease with written notice to Lessor.

If the loss occurs in the last 18 months of the Term or extension thereof, either party may terminate this Lease effective the date of the casualty by giving the other party written notice of such election within 30 days of the casualty. In the event of partial loss or damage, the rent shall be abated by the proportion of the Leased Premises rendered unfit for use or safe tenancy.

## 21.
### Default

If Lessee fails to pay any installment of rent due under this Lease or fails to comply with any other provision of this Lease, within ten (10) days after written notice by Lessor to Lessee demanding same, provided that said written notice need not be given with

- 11 -

**CONFIDENTIAL**          **SUNBELT  000786**

regard to nonpayment of rent after such notice has been given twice during any calendar year, or if Lessee abandons the Leased Premises or abandons the Leased Premises or removes from the Leased Premises any property against which Lessor is entitled to a Lessor's lien or makes an assignment for the benefit of creditors or is adjudged a bankrupt in an involuntary bankruptcy proceeding or files any type of proceeding or applies for any relief under the laws of the United States relating to bankruptcy or State laws relating to insolvency or if a receiver or other custodian is appointed for Lessee for any of Lessee's property by any court, or if Lessee shall fail to perform any other obligation or to comply with any other provision of this Lease, and such default shall continue for a period of thirty (30) days after written notice therefor from Lessor to Lessee, then, in any such event, Lessor shall have the right, at Lessor's option, without putting Lessee in default and without notice of default, (1) to cancel this Lease effective immediately or effective as of the date Lessor may select or, (2) to proceed one or more times for past due installments of rent only, without prejudicing the right to proceed later for additional installments or exercise any other remedy, or (3) to declare the unpaid rent for the entire unexpired term of this Lease immediately due and payable and at once demand and receive payment thereof or, (4) to have recourse to any other remedy or mode of redress to which Lessor may be entitled by law. In the event Lessor exercises the right to cancel this Lease, then (a) Lessor shall have the right, as soon as said cancellation is effective, to re-enter the Leased Premises and re-let the same for such price and on such terms as may be immediately available, and (b) Lessee shall be and remain liable not only for all rent payable to the date such cancellation becomes effective, but also for all damage or loss suffered by Lessor for the remaining term of this Lease resulting from such cancellation. Failure of Lessor to exercise any right granted in this Paragraph shall not be construed as a waiver of the right to subsequently enforce for a new default such right and no indulgence by Lessor shall be construed as a waiver of any right herein granted.

Notwithstanding any other provisions of this Lease, where the curing of an alleged default requires more than payment of money, and the work of curing said default cannot reasonably be accomplished within the time otherwise permitted herein, and where Lessee has commenced upon the work of curing said default and is diligently pursuing same, then Lessee shall be entitled to reasonable time extensions to permit the completion of the work of curing said default, as a condition precedent to any re-entry or termination, and any defect so cured shall not thereafter be grounds for default.

Notwithstanding any of the terms and provisions herein contained to the contrary, Lessor and Lessee shall each have the duty and obligation to mitigate, in every reasonable manner, any and all damage that may be caused or suffered by virtue of defaults under or violation of any of the terms and provisions of this Lease committed by the other, exercising sound business practices.

- 12 -

**CONFIDENTIAL**          **SUNBELT  000787**

## 22.
### Attorney's Fees

In the event it becomes necessary for Lessor or Lessee to employ an attorney to enforce collection of the rents and other amounts agreed to be paid, or to enforce compliance with any of the covenants and agreements herein contained, the defaulting or breaching party shall pay all reasonable attorney's fees, costs and expense occasioned by such default(s) or breach (es).

## 23.
### Sale of Leased Premises, Release of Lessor on Sale

Lessor is freely permitted, subject to the Right of First Refusal in favor of Lessee, to transfer the Leased Premises, this Lease and Lessor's rights under this Lease. Upon a sale or transfer of the Leased Premises, by Lessor or a subsequent purchaser or transferor thereof, the purchaser or transferee by virtue of such sale or transfer shall be bound for the performance of all Lessor's agreements and obligations under this Lease and the vendor or transferor shall thereupon be released from any and all liability thereafter arising under this Lease.

## 24.
### Right of First Refusal

If at any time during the term of this Lease, Lessor desires to sell, convey or otherwise transfer all or any interest in the Property and/or Leased Premises and receives a bona fide offer from a prospective purchaser, Lessor shall notify Lessee in writing ("Lessor's Notice") of the terms and conditions of such offer. The Lessee shall have the right of first refusal to purchase the Property and/or Leased Premises on the same terms and conditions as the bona fide offer from the prospective purchaser, by notifying Lessor of its intent to so acquire the Property and/or Leased Premises within ten (10) business days after the receipt of Lessor's Notice. If at the end of said ten (10) business day period, Lessee fails to notify the Lessor of its election to purchase the Property and/or Leased Premises, Lessor may sell the Property and/or Leased Premises (subject to the rights of the Lessee pursuant to the terms of this Lease), provided such sale is fully completed within 180 days after receipt of the Lessor's Notice. If such sale is not fully completed within said 180 days, Lessor shall again provide Lessor's Notice and Lessee shall have the right to purchase as provided herein.

- 13 -

**CONFIDENTIAL**          **SUNBELT  000788**

25.
### Notices

Any notice, demand, request, document or other act of communication required or permitted to be given under this Lease shall be in writing and may be delivered in person or shall be deemed to be delivered when sent by United States Certified or Registered Mail, postage prepaid, return receipt requested, or by reliable overnight carrier such as Federal Express and addressed to the parties hereto at their respective address as designated herein or at such other address as either party may from time to time direct, by written notice in accordance herewith.

Lessor:     SHAF-LAND, L.L.C.
            12717 Hooper Road
            Baton Rouge, Louisiana 70868
            Attention: Manager

Lessee:     Sunbelt Chemicals Corp.
            71 Hargrove Grade
            Palm Coast, Florida 32137
            Attention: President

26.
### American with Disabilities Act (ADA)

Lessee hereby represents that it is a public accommodation as defined in the ADA. Upon commencement of the Lease, the Lessee at its sole cost and expense shall be solely responsible for taking any and all measures which are required to comply with the requirements of Title I and/or Title III of the ADA within Lessee's Leased Premises. Any alterations to the Leased Premises made by Lessee for the purpose of complying with the ADA or which otherwise require compliance with the ADA shall be done in accordance with this Lease; provided, that Lessor's consent to such alterations shall not constitute either Lessor's assumption, in whole or in part, of Lessee's responsibility for compliance with the ADA, or representation or confirmation by Lessor that such alterations comply with the provisions of the ADA.

Lessee shall indemnify the Lessor for all claims, damages, judgments, penalties, fines, administrative proceedings, costs, expenses and liability arising from Lessee's failure to comply with any of the requirements of Title I and/or Title III of the ADA within Lessee's Leased Premises.

- 14 -

**CONFIDENTIAL**          **SUNBELT  000789**

Lessor shall indemnify the Lessee for all claims, damages, judgments, penalties, fines, administrative proceedings, costs, expenses and liability arising from Lessor's failure to comply with Title III of the ADA within the common areas.

## 27.
### Miscellaneous

Failure of Lessor to require strict performance by Lessee of any of the covenants, provisions or conditions of this Lease, on one or more occasions, shall not constitute a waiver by Lessor of the right thereafter to require strict compliance with said covenants, provisions and conditions.

## 28.
### Governing Law

This Lease shall be deemed to be a contract made under the laws of the State of Louisiana and shall be construed in accordance with and governed by the laws of the State of Louisiana and ordinances of the municipality and parish where the Leased Premises is situated and the rules and regulations of their duly constituted authorities.

## 29.
### Recording

Recording of the Lease is prohibited except as allowed in this paragraph. At the request of either party, the parties shall promptly execute and record, at the cost of the requesting party, an extract of the Lease in accordance with La. R.S. 44:104.

## 30.
### Subordination/Non-Disturbance

Lessor agrees to furnish Lessee with a non-disturbance agreement as hereinafter provided with respect to any mortgage which presently or any time in the future encumbers the premises within ten (10) days after the execution of this Lease or any such mortgage, whatever the case may be. Lessee agrees that this Lease shall at all times be subject and subordinate to the lien of any mortgage that now or hereafter encumbers or affects the Leased Premises and to all renewals, modifications, consolidations, replacements and extensions thereof; provided, however, as a condition to this subordination provision, the Lessor shall obtain from any such mortgagee an agreement in writing, in recordable form acceptable to Lessee, providing in substance that, so long as a default has not occurred under the Lease, , such mortgagee will not disturb Lessee's possession, deprive Lessee of any rights or increase Lessee's obligations under the Lease, nor shall this Lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchase at such foreclosure

- 15 -

**CONFIDENTIAL**          **SUNBELT 000790**

sale, or who acquires title to the Building as a result of such enforcement, shall be bound to Lessee for the terms of this Lease, the rights of Lessee hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect; provided, however, that Lessee fully performs all of its obligations hereunder.

Both parties agree that if called upon by the other each will, within ten (10) days of prior written request of either party, execute an estoppel certificate identifying this Lease, and acknowledging the status of the performance of the requesting party's obligations under this Lease as of the date of such estoppel certificate.

## 31.
## Condemnation

If all of the Leased Premises are taken by condemnation or eminent domain proceedings, or if so much of the Leased Premises are so taken that the remainder is inadequate for Lessee's business purposes, this Lease shall terminate.    In such condemnation proceedings, Lessee may claim compensation for moving expenses and for the taking of any removable installations which by the terms of this Lease Lessee would be permitted to remove at the expiration of this Lease, if such award is separately allowed by the condemning authority, but Lessee shall be entitled to no additional award, and Lessee hereby waives all rights to proceeds for, the loss of its leasehold interest, it being agreed that all damages recoverable by reason of the value of the Leased Premises will belong and be payable to the Lessor.

## 32.
## Review of Documents

Notwithstanding any provision to the contrary in this Lease, the parties hereto acknowledge that (1) they have reviewed this Lease in detail prior to execution of same, and (2) they have had the opportunity to review this Lease with their respective counsel.

## 33.
## Conflicting Provisions

If there is any conflict between the printed portions and the typewritten or handwritten portions of this Lease, the typewritten or handwritten portions shall prevail.

- 16 -

**CONFIDENTIAL**          **SUNBELT  000791**

34.

Effect of Provisions

All of the provisions contained herein, shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, executors, administrators, successors and assigns. If any section, paragraph, sentence or portion of this Lease or the application thereof to any party or circumstance shall, to any extent, be or become invalid or illegal, such provision is and shall be null and void, but, to the extent that said null and void provisions do not materially change the overall agreement and intent of this entire Lease, the remainder of this Lease shall not be affected thereby and each remaining provision of this Lease shall be valid and enforceable to the fullest extent provided by law.

35.

Entire Agreement

The whole agreement between the parties hereto is set forth in this instrument and they shall not be bound by any oral or written agreements, conditions, understanding or representations other than are expressly stipulated and set forth herein or in any amendments hereto. Any amendments or other changes to the terms and conditions to this Lease are to be in writing and signed by the parties hereto.

LESSOR:
SHAF-LAND, L.L.C.,
a Louisiana limited liability company

By: _Richard D Shofford_
Name: _Richard D Shofford_
Title: _manager_

LESSEE:
Sunbelt Chemicals Corp.,
a South Carolina Corporation

By: _[signature]_
Name: _R. Patricia Weston_
Title: _Secretary_

- 17 -

CONFIDENTIAL          SUNBELT 000792

Exhibit A
Legal Description

One certain tract or parcel of land, together with all buildings and improvements thereon and all rights, ways, privileges and appurtenances thereunto belonging, containing 10.50 acres, lying and forming portions of Sections 57, 58 and 59, T-7-S, R-12-E, and Section 50, T-6-S, R-12-E, Ward 4, West Baton Rouge Parish, Louisiana, and being a portion of the property known as the Poplar Grove Plantation. Said tract of land herein conveyed being designated as TRACT PGP-1A-2 on the plat of survey prepared by Joseph Garrett, R.L.S., dated November 20, 1995, entitled, "MAP SHOWING SURVEY OF TRACT PGP-1A-1 AND TRACT PGP-1A-2 BEING THE RESUBDIVISION OF TRACT PGP-1A, FORMERLY A PORTION OF POPLAR GROVE PLANTATION LYING WEST OF LOUISIANA HIGHWAY ONE (1) LOCATED IN SECTION 50, T-6-S, R-12-E, AND SECTIONS 57, 58 AND 59, T-7-S, R-12-E, SOUTHEASTERN LAND DISTRICT WEST OF THE MISSISSIPPI RIVER, WEST BATON ROUGE PARISH, LOUISIANA FOR DISCOVERY INDUSTRIAL DEVELOPMENT CORPORATION", and further shown on Map Showing Boundary Survey with Improvements of Tract PGP-1A-2 of Poplar Grove Plantation for Sunbelt Chemicals II, LLC prepared by Patin Engineers and Surveyors, Inc. (Cletus Langlois, PLS) dated December 4, 2007 (Job No. 07-207) ("the Property).

SUBJECT TO AND INCLUDING ALL BENEFITS OF : (1) A predial servitude and covenant to run with the land, as a perpetual servitude of access from Safe Energy Drive, in favor of Tract PGP-1A-1, designated as "25' Servitude of Access" on the western boundary of the tract conveyed herein, more particularly shown and described on the Garrett plat of survey hereinabove referred to; (2) A predial servitude and covenant to run with the land, as a perpetual servitude of access being a portion of Safe Energy Drive, in favor of Tract PGP-1A-1 and Tract PGP-1B, and such other properties as per agreements of record and/or as may be granted by vendor, designated as "70' Access Road Servitude" on the northern boundary of the tract conveyed herein, more particularly shown and described on the plat of survey hereinabove referred to; and (3) all servitudes and easements as shown on the above described plat of survey; and (4) This description includes a predial servitude and covenant to run with the land for the non-exclusive use of that certain "50' Railroad Spur Servitude" as is more particularly shown and described on plats of survey hereinabove described and in the public records of West Baton Rouge Parish, Louisiana and further includes a predial servitude and covenant to run with the land for the non-exclusive use of Safe Energy Drive as is more particularly shown and described on the plats of survey hereinabove described and in the public records of West Baton Rouge Parish, Louisiana; and (5) Including, all rights in favor of the Property as granted under Road Right of way and Servitude Agreement filed of record on March 19, 1987, at COB 221, page 161, Official Records of West Baton Rouge Parish, LA, as amended at act filed of record on September 3, 1987, at COB 228, page 24; and (6) Including all rights in favor of the Property as granted under Predial Servitude

- 18 -

**CONFIDENTIAL**          **SUNBELT 000793**

and Boundary Agreement filed of record on July 27, 1994, at COB 320, page 154, Official Records of West Baton Rouge Parish, LA (herein collectively referred to as the "Property".)

**CONFIDENTIAL**          **SUNBELT  000794**

## EXTRACT OF LEASE

Pursuant to Louisiana R.S. §44:104, the parties hereto, for the purposes of giving record notice of that certain Lease dated April 4, 2008, (the "Lease"), between SHAF-LAND, L.L.C., a Louisiana limited liability company ("Lessor"), and Sunbelt Chemicals Corp., a South Carolina corporation ("Lessee"), hereby set forth the following:

1.  **Lessor:**  SHAF-LAND, L.L.C., a Louisiana limited liability company.

2.  **Lessee:**  Sunbelt Chemicals Corp., a South Carolina corporation.

3.  **Date of Execution of Lease:** Lease dated April 4, 2008;

4.  **Description of Leased Property:**

    Three (3) buildings containing a total of approximately 75,700 rentable square feet having a street address of 1259 Safe Energy Drive, Port Allen, Louisiana 70767, together with any parking spaces or areas serving the property

5.  **Primary Term of Lease:** The Primary Term of the Lease shall commence on April 4, 2008 and shall run for a period ending April 3, 2015.

6.  **Renewal Options:**  Lessee shall have the option(s) to extend the term of this Lease for (2) consecutive extended term(s), the first extended term shall be for a period of two (2) years, and the second extended term shall be for a period of three (3) years.

7.  **Option to Purchase:**  The Lease contains a right of first refusal for the Lessee to purchase the Leased Premises during the lease term, subject to the conditions set forth in the Lease.

8.  **Incorporation of Lease:** This Extract is for informational purposes, and nothing contained herein shall be deemed in any way to modify or otherwise affect the terms or conditions of the Lease. All terms and conditions of the Lease are hereby incorporated herein by reference. In the event of any inconsistency between the terms of the Lease and this Extract, the terms of the Lease will control.

**CONFIDENTIAL**          **SUNBELT 000795**

**IN WITNESS WHEREOF,** Lessor and Lessee have executed this Extract of Lease to be effective as of April 4, 2008.

WITNESSES FOR LESSOR:

(1) _Samuel A. Bacot_

(2) _Cindy N. Shotwell_

SHAF-LAND, L.L.C.,
a Louisiana limited liability company

By: _____
Name: _Richard D Shoffett_
Title: _Manager_

WITNESSES FOR LESSEE:

(1) _____

(2) _____

SUNBELT CHEMICALS CORP.,
a South Carolina corporation

By: _____
Name: _R. Patrick Weston_
Title: _Secretary_

STATE OF LOUISIANA
PARISH OF WEST BATON ROUGE
I HEREBY CERTIFY that the within and foregoing is
true and correct copy of the original as recorded on the _____ day of
_____ 200_ of the _____ in Book _480_ Page _____ Records of
Entry Number _____ of _____ 100_ at _874_ M. ___ A.M. ___ P.M.
West Baton Rouge Parish Louisiana, at _____
IN FAITH WHEREOF, Witness my hand and the impression
of the seal of my said office at Port Allen, Louisiana, on this _____
day of _____ AD, 20__

_____
DEPUTY CLERK OF COURT

SUNBELT_ Extract of Lease (2)

2

**CONFIDENTIAL**          **SUNBELT 000796**



**BIENVENU
BONNECAZE
FOCO** APLLC
**VIATOR
& HOLINGA**

PHILLIP E. FOCO
*Partner*

225.388.5603 *(Direct)*
225.388.5622 *(Fax)*
phillip.foco@bblawla.com

May 5, 2015

Wells Fargo Insurance Services USA, Inc.          **Via Certified Mail**
Through its Agent for Service of Process:          *Article No. 7014 2120 0002 6146*
Commissioner of Insurance
1702 North Third Street
Baton Rouge, LA 70802

Re:     SHAF-LAND, L.L.C.
        Leased property at 1259 Safe Energy Drive, Port Allen, Louisiana 70767

Dear Sir:

My firm has been retained by SHAF-LAND, L.L.C. in connection with certain damage caused to its property that is located at 1259 Safe Entergy Drive, Port Allen, Louisiana 70767, which property was subject to a Commercial Lease executed by and between SHAF-LAND, L.L.C. and your insured, Sunbelt Chemicals Corp. As you will see from the attached correspondence and exhibits (on CD), Sunbelt's operations on the leased premises caused extensive damage to the Leased Premises. It has come to our attention that you have issued a policy or policies that provide coverage for all or part of the damage caused by Sunbelt's operations. Although there may be additional policies issued by you that provide coverage for some or all of the damages in question, it would appear that, at the very least, Policy No. 4068312 issued on May 1, 2012 is applicable to the current dispute. As mentioned above, we have attached for your review a copy of the Commercial Lease executed between SHAF-LAND, L.L.C. and Sunbelt Chemical Corp, Certificate of Liability Insurance No. 4509188, correspondence dated February 13, 2015 and May 5, 2015 directed to Sunbelt Chemical Corp along with photographs and other materials attached to said correspondence that depict some of the damage for which we are seeking recovery on behalf of our client, SHAF-LAND, L.L.C.

We hereby make demand under Policy No. 4068312, and any other applicable policy of insurance, for restoration and/or repair costs occasioned by the operations of your insured, Sunbelt Chemicals Corp. on the Leased Premises.

Very truly yours,

BIENVENU, BONNECAZE, FOCO, VIATOR & HOLINGA, APLLC

Phillip E. Foco

PEF/vp

Enclosure

cc:     Tim Capp (via U.S. Mail)

CONFIDENTIAL

SUNBELT 000797