UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SHAF-LAND, L.L.C. | * | C.A. NO. 3:15-CV-00588-JJB-EWD |
| | * | |
| Plaintiff | * | |
| | * | JUDGE:  JAMES BRADY |
| VERSUS | * | |
| | * | |
| SUNBELT CHEMICALS CORP. AND | * | MAGISTRATE JUDGE: |
| AIG SPECIALTY INSURANCE | * |         ERIN WILDER-DOOMES |
| COMPANY | * | |
| | * | |
| Defendants | * | |

**SHAF-LAND'S MEMORANDUM IN OPPOSITION
TO ASIC'S MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING LACK OF "CLEAN UP COSTS" UNDER COVERAGE D-1**

**BIENVENU, BONNECAZE, FOCO, VIATOR & HOLINGA, APLLC**

Phillip E. Foco, #25670
Anthony J. Lascaro, #32546
Patrick H. Hunt, #34599
Colin P. O'Rourke, #37252
4210 Bluebonnet Blvd.
Baton Rouge, LA 70809
Phone:  (225) 388-5600
Fax:  (225) 388-5622
phillip.foco@bblawla.com
anthony.lascaro@bblawla.com
patrick.hunt@bblawla.com
colin.orourke@bblawla.com

*Attorneys for SHAF-LAND, L.L.C.*

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

I.   ASIC fails to meet the summary judgment standard ............................................. 1

II.   ASIC's applies and overly-narrow reading of Coverage D-1 in an attempt to foreclose the

availability of coverage for SHAF-LAND's claims ...................................................... 2

III.   The magnitude of the required "clean-up costs" and restoration should not dictate the

availability of coverage under the ASIC Policies ......................................................... 5

IV.   The fact that ASIC refused to perform and SHAF-LAND mitigated its damages should not

preclude coverage. ............................................................................................................ 6

V.   Conclusion ........................................................................................................................ 8

## TABLE OF AUTHORITIES

**Cases**

*Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23 (1986) ............................................................................................ 2

*Francioni v. Hartford Casualty Insurance Company*,

No. 15-528, slip op. at 3 (M.D. La. 2017) ...................................................................... 2

*LeBlanc v. Wyeth, Inc.*,

495 F.Supp.2d 609, 612 – 13 (W.D. La. 2007) ............................................................... 2

**Statutes**

La. Civ. Code art. 2047 .................................................................................................... 6

**Rules**

Fed. R. Civ. P. 56(a). ..................................................................................................... 1

**SHAF-LAND'S MEMORANDUM IN OPPOSITION**
**TO ASIC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**REGARDING LACK OF "CLEAN UP COSTS" UNDER COVERAGE D-1**

MAY IT PLEASE THE COURT:

Plaintiff, SHAF-LAND, L.L.C. ("SHAF-LAND"), respectfully submits this memorandum in opposition to the Motion for Partial Summary Judgment Regarding the Lack of "Clean Up Costs" Under Coverage D-1 filed by Defendant AIG Specialty Insurance Company ("ASIC"). ASIC's motion requests that this Court grant partial summary judgment in its favor, declaring that no coverage is available under Coverage D-1 of either Policy No. EG 4068312, effective May 1, 2014 to May 1, 2015 (the "First Policy"), or a renewal policy, also numbered Policy No. EG 4068312, effective May 1, 2015 to May 1, 2016 (the "Second Policy") (collectively referred to as "the ASIC Policies"). ASIC alleges that neither Sunbelt Chemicals Corp. ("Sunbelt") nor SHAF-LAND provided any evidence of "clean-up costs" as that term is defined in the ASIC Policies, thus precluding any implication of potential coverage. This rationale is premised an overly-narrow reading of critical terms as they are defined within the ASIC Policies. SHAF-LAND's claims against Sunbelt and ASIC fall under Coverage D-1, and SHAF-LAND has produced evidence to support such claims. At the very least, SHAF-LAND has established that there is an issue of material fact such that summary judgment is improper.

## I.    ASIC fails to meet the summary judgment standard

Summary judgment should be granted if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.[1] A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the "absence of a genuine issue of

---

[1] Fed. R. Civ. P. 56(a).

material fact."[2]  "In adjudicating a motion for summary judgment, the Court must view all facts in the light most favorable to the non-movant[,]" and "[t]he function of the court, therefore, is to make the threshold inquiry of determining whether there is a need for a trial."[3]

"Once the movant makes this showing, the non-movant must demonstrate that there is evidence in the record establishing that there is a genuine issue of material fact for trial."[4] "Summary judgment declaring a lack of coverage under an insurance policy is not proper unless there is no reasonable interpretation of the policy, when applied to the undisputed facts shown by the evidence supporting the motion, under which coverage could be afforded."[5]

## II.    ASIC's applies and overly-narrow reading of Coverage D-1 in an attempt to foreclose the availability of coverage for SHAF-LAND's claims

ASIC alleges that no coverage exists under Coverage D-1 of the ASIC Policies for SHAF-LAND's claims.  While ASIC quotes the language of the ASIC Policies in its Motion[6], ASIC fails to emphasize all the requisite defined terms when reaching its conclusion that Coverage D-1 fails to provide coverage for SHAF-LAND's claims.  In addition to "clean-up costs,"[7] "environmental laws,"[8] and "restoration costs,"[9] the following defined terms are also important to a coverage determination:

> 31. **Pollutants** means **any solid, liquid, gaseous or thermal irritant or contaminant**, including, but not limited to, smoke, **vapors**, soot, **fumes**, **acids**, alkalis, toxic chemicals, hazardous substances, low-level radioactive material, electromagnetic fields, medical waste including infectious and pathological waste and waste materials.  Waste materials includes materials to be recycled,

---

[2] Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
[3] LeBlanc v. Wyeth, Inc., 495 F. Supp. 2d 609, 612–13 (W.D. La. 2007).
[4] *Id.* at 613.
[5] Francioni v. Hartford Casualty Insurance Company, No. 15-528, slip op. at 3 (M.D. La. 2017).
[6] *See,* R.Doc. 92-1.
[7] R.Doc. 17-7 at ASIC POL 0000167 (emphasis added); R.Doc. 17-8 at ASIC POL 0000070 (emphasis added).
[8] R.Doc. 17-7 at ASIC POL 0000131 (emphasis added); R.Doc. 17-8 at ASIC POL 0000043 (emphasis added).
[9] R.Doc. 17-7 at ASIC POL 0000137 (emphasis added); R.Doc. 17-8 at ASIC POL 0000049 (emphasis added).

reconditioned or reclaimed.  **Pollutants** shall include microbial matter and Legionella pneumophilia.[10]

32. **Pollution Conditions** means:

1. **The discharge, dispersal, release or escape**; or
2. The illicit abandonment on or after the date first listed in Item 2. of the Declarations at an insured property by a third party without the consent of the responsible insured,

**of pollutants into** or upon land, or **any structure on land**, the atmosphere or any watercourse or any body of water, including groundwater, provided such conditions are not naturally present in the environment in the amounts or concentrations discovered.[11]

"Clean-up costs" as provided for in Coverage D-1 includes "investigation, removal, treatment including in-situ treatment, remediation including associated monitoring, or disposal of soil, surfacewater, groundwater, microbial matter, legionella pneumophilia or *other contamination* … to the extent required by environmental laws," and also includes "restoration costs."[12] Critically, "environmental laws" is broadly defined as "any federal, state, provincial or local laws (including, but not limited to, statutes, rules, regulations, ordinances, guidance documents, and governmental, judicial or administrative orders and directives) that are *applicable* to pollution conditions."[13]  In turn, "pollution conditions" is defined as "[t]he discharge, dispersal, release or escape … of pollutants into or upon … any structure on land."[14]  Finally, "pollutants" is defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to, … vapors, … fumes, [and] acids."[15]

The hydrochloric acid and hydrochloric acid fumes which caused the damage to the main

---

[10] R.Doc. 17-7 at ASIC POL 0000168 (emphasis added); R.Doc. 17-8 at ASIC POL 0000071 (emphasis added).
[11] R.Doc. 17-7 at ASIC POL 0000168 (emphasis added); R.Doc. 17-8 at ASIC POL 0000071 (emphasis added).
[12] R.Doc. 17-7 at ASIC POL 0000167; R.Doc. 17-8 at ASIC POL 0000070.
[13] R.Doc. 17-7 at ASIC POL 0000131; R.Doc. 17-8 at ASIC POL 0000043.
[14] R.Doc. 17-7 at ASIC POL 0000168; R.Doc. 17-8 at ASIC POL 0000071.
[15] R.Doc. 17-7 at ASIC POL 0000168; R.Doc. 17-8 at ASIC POL 0000071.

building at 1259 Safe Energy Drive in Port Allen, Louisiana—the property at issue in this litigation—fall well within "contamination," the "investigation, removal, treatment including in-situ treatment, remediation including associated monitoring, or disposal" of which is covered under "clean-up costs" in Coverage D-1.[16]  Because "contamination" is not a defined term in the ASIC Policies, it "must be given [its] generally prevailing meaning."[17]  Helpfully, under the ASIC Policies, an illustrative list of contaminants is provided under the defined term "pollutants," and includes "vapors, … fumes, [and] acids."[18]  Certainly, the acidic fumes emitted by Sunbelt in violation of its DEQ permit is considered contamination by any definition.

One manner in which "clean-up costs" are covered under Coverage D-1 is "to the extent required by environmental laws."[19]  The broad definition of "environmental laws" in the ASIC Policies encompasses the very laws under which SHAF-LAND makes its claims against Sunbelt and ASIC—namely Louisiana Civil Code Articles 2315 and 2682 *et seq*.  The Civil Code articles providing for the obligations of lessees as they relate to lessors and leased property are plainly "applicable to pollution conditions." "Pollution conditions," as that term is defined in the ASIC Policies, can clearly result in damage, such that a lessee would be liable to his lessor.  This is precisely the factual scenario at the center of this litigation.  As explained in SHAF-LAND's Motion for Summary Judgment, these very laws require ASIC's insured, Sunbelt, to clean up the pollutants present and remedy the damage caused by said pollutants.  Here, the "pollution conditions," defined as the "[t]he discharge, dispersal, release or escape … of pollutants into or upon … any structure on land,"[20] were the spills and releases of hydrochloric acid and hydrochloric

---

[16] R.Doc. 17-7 at ASIC POL 0000167; R.Doc. 17-8 at ASIC POL 0000070.
[17] La. Civ. Code art. 2047.
[18] R.Doc. 17-7 at ASIC POL 0000168; R.Doc. 17-8 at ASIC POL 0000071.
[19] R.Doc. 17-7 at ASIC POL 0000167; R.Doc. 17-8 at ASIC POL 0000070.
[20] R.Doc. 17-7 at ASIC POL 0000168; R.Doc. 17-8 at ASIC POL 0000071.

acid fumes into the main building at 1259 Safe Energy Drive in Port Allen, Louisiana.  As discussed, hydrochloric acid and the associated fumes fall squarely within "pollutants" as defined in the ASIC Policies.

### III.   The magnitude of the required "clean-up costs" and restoration should not dictate the availability of coverage under the ASIC Policies

Under the provisions of the ASIC Policies, ASIC "will pay loss that [Sunbelt] becomes legally obligated to pay as a result of claims for … clean-up costs resulting from pollution conditions on … [1259 Safe Energy Drive, Port Allen, LA]."[21]  The magnitude of the required clean-up, restoration, and the costs associated therewith should not affect coverage under the ASIC Policies.  Under the clear terms of the ASIC Policies discussed above, ASIC provides coverage for the costs of Sunbelt's obligations for "removal, treatment …, remediation …, or disposal" of the hydrochloric acid and hydrochloric acid fumes present on the floors, walls, support structures, and roof of the main building at 1259 Safe Energy Drive, as well as reasonable and necessary "restoration costs" incurred by Sunbelt while incurring "clean-up costs."  Due to the severity of the pollutants present and the damage caused to the main building by those very pollutants, "removal, treatment …, remediation …, or disposal"—and importantly restoration of the building to its previous condition—were most efficiently achieved by removal and replacement of the building.  As explained by Matt Torrance, repair and restoration of the building was not an economically viable option.[22]  While it could have been done, it would have cost more to repair it than it would to simply remove and replace it.  ASIC should not be able to avoid coverage because the covered pollution conditions were so severe that restoration is more expensive than

---

[21] R.Doc. 17-8 at ASIC POL 0000017-18 (as amended by End. 7 at ASIC POL 0000067); R.Doc. 17-7 at ASIC POL 0000105-106 (as amended by End. 11 at ASIC POL 0000171-172).
[22] R.Doc. 94-24 at 1-2, 5-6.

replacement and Plaintiff only seeks as its recovery the less expensive option.

For example, pursuant to the language discussed above, ASIC would provide coverage for the removal, treatment, and remediation of hydrochloric acid from a wall of the building.  After removal, treatment, and remediation, ASIC would provide coverage for the cost to restore the wall to its previous condition—this might include patching any hole and repainting the surface to prevent any further issues.  If such a scenario would be covered under the ASIC Policies, and it is, why would the present scenario, where the pollution conditions present on the property were so severe that remediation and restoration of the structure is economically impractical, and replacement is the more economically viable option, not be covered?  Indeed, consider the scenario of contamination to the soil of the Property.  While there may be occasions where in-situ treatment of that soil is appropriate, if in-situ treatment would not serve to properly remediate the contamination, there can be little doubt that ASIC would be required to pay for the costs to remove and replace that contaminated soil with new soil.  As the ASIC Policies define "pollution conditions" to include "the discharge, dispersal, release or escape of pollutants into or upon land, **or any structure on land**," there is no distinction between ASIC's obligation to pay for the replacement of soil damaged by pollution conditions and its obligation to pay for the replacement of a structure damaged by pollution conditions, particularly where those pollution conditions either cannot be adequately remediated in-situ and/or in-situ remediation would be more costly than replacement.

**IV.   The fact that ASIC refused to perform and SHAF-LAND mitigated its damages should not preclude coverage.**

ASIC alleges that SHAF-LAND has provided no evidence of "clean-up costs," but in fact SHAF-LAND's Motion for Summary Judgment provides extensive evidence, both fact and expert,

demonstrating the extent of "clean-up costs," as defined in the ASIC Policies.[23]  SHAF-LAND initially made demand for costs associated with remediation and restoration of the property at issue in this litigation[24]—claims that fall squarely within the definition of "clean-up costs" under the ASIC Policies.  Sunbelt's failure to perform its obligations of restoration of the property to its pre-pollution condition, in combination with ASIC's denial of coverage, forced SHAF-LAND to convert its claim to one styled as a claim for diminution in value.  In part through the expertise of Matthew Torrance, SHAF-LAND determined that the cost to remediate and restore the main building at 1259 Safe Energy Drive would be greater than the cost to completely replace the structure—$1,150,691.00.[25]  SHAF-LAND made the most reasonable decision it could under the circumstances, mitigating its losses, and selling the building for $1,700,000.00, which resulted in in a loss of only $925,000.00.[26]

While not specifically labeled as "clean-up costs," SHAF-LAND's claims clearly fall within "clean-up costs" as that term is defined in the ASIC Policies.  Sunbelt and ASIC's failure to perform, forcing SHAF-LAND to mitigate its damages, should not excuse ASIC from its obligation to provide coverage under the applicable policies.  If such were the case, ASIC would have no incentive to ever admit coverage on a policy of this nature.  Instead, ASIC could leverage third-party claimants into selling their damaged property at a loss, converting their claims for "clean-up costs" into claims for diminution in value, thus allowing ASIC to avoid coverage altogether.

---

[23] See SHAF-LAND's Motion for Summary Judgment and the attached memorandum in support and exhibits.  R.Doc. 94-2 – 94-27.
[24] *See*, R.Doc.1-2.
[25] R.Doc. 94-24 at 1-2, 5-6.
[26] R.Doc. 94-13 at 1-3; R.Doc. 94-23 at 1-2.

V.      **Conclusion**

As set forth herein, SHAF-LAND has established there is at least a genuine issue of material fact as to the existence of "clean-up costs", if not full coverage under Coverage D-1 of the ASIC Policies for SHAF-LAND's claims, and ASIC is not entitled to summary judgment on this issue.  Accordingly, SHAF-LAND, L.L.C. prays that AIG Specialty Insurance Company's Motion for Partial Summary Judgment Regarding Lack of "Clean Up Costs" Under Coverage D-1 be denied.

Respectfully submitted,

**BIENVENU, BONNECAZE, FOCO, VIATOR & HOLINGA, APLLC**

By **s/Phillip E. Foco** _____

Phillip E. Foco, #25670
Anthony J. Lascaro, #32546
Patrick H. Hunt, #34599
Colin P. O'Rourke, #37252
4210 Bluebonnet Blvd.
Baton Rouge, LA 70809
Phone:  (225) 388-5600
Fax:  (225) 388-5622
phillip.foco@bblawla.com
anthony.lascaro@bblawla.com
patrick.hunt@bblawla.com
colin.orourke@bblawla.com

*Attorneys for SHAF-LAND, L.L.C.*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

Baton Rouge, Louisiana, this 15th of May, 2017.

_____ s/Phillip E. Foco _____
Phillip E. Foco